[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 474.]

SCIOTO MEMORIAL HOSPITAL ASSOCIATION, INC., APPELLEE AND CROSS-APPELLANT, *v.* PRICE WATERHOUSE, APPELLANT AND CROSS-APPELLEE.

[Cite as *Scioto Mem. Hosp. Assn., Inc. v. Price Waterhouse*, 1996-Ohio-365.]

*Torts—Negligence—Ohio's comparative negligence law applicable to client's claim against accountant for professional negligence.*

Ohio's comparative negligence law is applicable to a client's claim against its accountant for professional negligence.

(No. 94-409—Submitted September 12, 1995—Decided February 7, 1996.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Franklin County, No. 90AP-1124.

———————————

{¶ 1} Appellee and cross-appellant, Scioto Memorial Hospital Association, Inc. ("Scioto"), began planning the construction of Richmond Place, a residential retirement center in Lexington, Kentucky. Appellant and cross-appellee, Price Waterhouse ("PW"), was hired by Scioto in 1981 to advise it on the financial feasibility of Richmond Place. PW was hired to review the work of the architect, the underwriter, Hereth, Orr & Jones, Inc. ("HOJ"), and the marketing consultant, American Retirement Corporation ("ARC"), and to recommend to Scioto whether to proceed with the Richmond Place investment.

{¶ 2} PW wrote and mailed to Scioto an engagement letter regarding PW's role as a financial-feasibility consultant for Scioto's investment. Pursuant to the letter, PW was to issue a preliminary feasibility study. Following satisfactory results in that study and a decision to proceed, PW was to "review a detailed financial forecast." However, rather than reviewing a "forecast," PW reviewed a "financial projection" compiled by HOJ. PW explained to Scioto in a cover letter attached to HOJ's report that a "projection" "represents management's estimate of

its possible, but not necessarily most probable, future course of action. Financial forecasts, on the other hand, represent management's judgment, based on present circumstances, of the most likely set of conditions and their most likely course of action." The final report issued to Scioto assumed a projected occupancy rate of ninety-eight percent.

{¶ 3} The marketing consultant, ARC, marketed "pre-sales" of Richmond Place units in February 1982. Consultants, including PW, also reviewed the proposed terms of an agreement to be signed by future residents. The agreement contained an unusual and somewhat controversial term allowing for the refundability of the occupancy fees. The occupancy fees were significantly high, ranging from $40,000 to approximately $84,000, and the refundability was to be conditioned upon (1) the development being ninety-five percent occupied, and (2) the same apartment being sold to a new resident.

{¶ 4} Lowell Thompson, the hospital's president, testified that in the spring of 1982, "pre-sales" (defined as the receipt of $1,000 fully refundable deposits) were lagging and he voiced his concerns with PW, through John West. Thompson testified that John West reassured him that Richmond Place was a good project.

{¶ 5} On June 1, 1983, the project was seventy-percent complete when a fire swept through and destroyed virtually all but one wing of the retirement center's construction. Scioto decided to rebuild with $3.4 million it received from its insurance company. As of June 1984, however, only fifteen residents occupied Richmond Place, which had one hundred seventy units.

{¶ 6} Unable to make Richmond Place profitable, Scioto sold the center to ARC in June 1985 for $10 million. ARC was released from liability to Scioto when it bought Richmond Place.

{¶ 7} On August 9, 1985, Scioto brought suit against PW based upon alleged negligence and breach of contract. Scioto claimed that PW was negligent in failing adequately to assess and disclose to Scioto the risks associated with the

project. Scioto asserted at trial that had PW's report accurately reflected the financial "forecast," the Richmond Place project would not have been undertaken. PW asserted at trial that the failure of Richmond Place was a result of residents' backing out after the fire due to delays in construction. PW also presented at trial evidence that Scioto's damages resulted from Scioto's lack of business-interruption insurance to cover the six-month delay in construction due to the fire, during which time monthly interest payments of $230,000 to service bonds continued to be payable.

**{¶ 8}** The trial court granted Scioto's motion <u>in limine</u> with respect to PW's defense of comparative negligence and excluded evidence relevant to that asserted defense based on the "audit interference" rule, first articulated in *Natl. Sur. Corp. v. Lybrand* (1939), 256 A.D. 226, 9 N.Y.S.2d 552. After a fifteen-week trial, the jury returned a general verdict for Scioto in the amount of $15,845,607.62. No instruction on the comparative negligence defense was given to the jury. PW's motion for a new trial to allow in evidence of Scioto's negligence was overruled.

**{¶ 9}** The court of appeals affirmed the trial court's judgment on liability but found that the damages were excessive. The court ordered a remand for retrial on the damages issue unless Scioto accepted a remittitur reducing the award to $8,771,000, plus interest. Scioto accepted the remittitur. On the issue of the comparative negligence defense, the court of appeals found no error, citing the audit interference rule, but stated that even if there was error in not allowing the comparative negligence defense, "any exclusion of evidence was nonprejudicial, Price Waterhouse referring extensively only to the exclusion of evidence as to the availability of loss-interruption insurance." The court found that Scioto's failure to obtain this insurance did not affect the losses caused by PW, but only those caused by the fire.

**{¶ 10}** This matter is now before this court upon the allowance of a motion and cross-motion to certify the record.

---

*James A. Readey; Thompson, Hine & Flory* and *Gerald L. Draper,* for appellee and cross-appellant.

*Vorys, Sater, Seymour & Pease, John C. Elam, Davis S. Cupps* and *Carl D. Smallwood,* for appellant and cross-appellee.

*Emens, Kegler, Brown, Hill & Ritter, L.P.A., S. Martijn Steger* and *Michael J. Galeano*, urging reversal for *amicus curiae*, Ohio Society of Certified Public Accountants.

*Clark, Perdue, Roberts & Scott* and *Edward L. Clark*, urging affirmance for *amicus curiae*, Ohio Academy of Trial Lawyers.

---

**FRANCIS E. SWEENEY, SR., J.**

{¶ 11} The main issue before this court is whether the comparative negligence defense is applicable to a professional negligence claim of a client against its accountant. For the following reasons, we find that the comparative negligence defense is applicable in accounting negligence cases. Accordingly, the trial court erred in granting the motion *in limine* and in not giving an instruction on the comparative negligence defense. Nevertheless, we affirm the court of appeals' upholding of the jury's verdict because the error was not prejudicial in this case.

{¶ 12} The "audit interference" rule was set forth in *Natl. Sur. Corp. v. Lybrand* (1939), 256 A.D. 226, 9 N.Y.S.2d 552. At that time, New York recognized contributory negligence as a complete bar to recovery. In *National Surety*, the New York Supreme Court, Appellate Division, held that contributory negligence constituted an affirmative defense for accountants only if the client's negligence contributed to the accountant's failure to perform his contract and to report the truth. While this rule was adopted by a number of jurisdictions, a review of these cases shows that none discusses its applicability in a state recognizing comparative negligence, with the exception of *Fullmer v. Wohlfeiler & Beck* (C.A. 10, 1990),

4

905 F.2d 1394 (applying Utah law). See *Lincoln Grain v. Coopers & Lybrand* (1984), 216 Neb. 433, 345 N.W.2d 300; *Jewelcor Jewelers & Distrib., Inc. v. Corr* (Pa.Super.1988), 542 A.2d 72; *Cereal Byproducts Co. v. Hall* (1956), 8 Ill.App.2d 331, 132 N.E.2d 27; *Greenstein, Logan & Co. v. Burgess Marketing, Inc.* (Tex. App.1987), 744 S.W.2d 170. The audit interference rule was made to soften what was then the "harsh rule" of negligence law which barred recovery of damages if there was any contributory negligence on the part of the plaintiff. Note, The Peculiar Treatment of Contributory Negligence in Accountants' Liability Cases (1990), 65 N.Y.U.L. Rev. 329, 354.

{¶ 13} However, in light of Ohio's comparative negligence statute enacted in 1980, R.C. 2315.19(A), there is no need for a special rule and, thus, we reject the application of the audit interference rule in Ohio. Hence, any negligence by a client, whether or not it directly interferes with the accountant's performance of its duties, can reduce the client's recovery. In so holding, we note that virtually all courts that have expressly considered the applicability of the audit interference rule to their comparative negligence states have agreed and rejected the rule. See *Halla Nursery, Inc. v. Baumann-Furrie & Co.* (Minn.1990), 454 N.W.2d 905, 909 ("Because we have broadly construed the comparative fault act and applied it to other professional malpractice actions, we *** hold that the trial court did not err in applying the principles of comparative fault in this action by a client against an accountant for negligent failure to discover embezzlements in the client's business."); *Fed. Deposit Ins. Corp. v. Deloitte & Touche* (E.D.Ark.1992), 834 F.Supp. 1129, 1144-1147 (applying Arkansas law); *Devco Premium Fin. Co. v. N. River Ins. Co.* (Fla.App.1984), 450 So.2d 1216 (declined to adopt the audit interference rule because it was based on principles of contributory negligence, which had been repudiated in Florida); *Capital Mtge. Corp. v. Coopers & Lybrand* (1985), 142 Mich.App. 531, 537, 369 N.W.2d 922, 925; *Natl. Credit Union Adm.*

*Bd. v. Aho, Henshue & Hall* (Aug. 30, 1991), E.D.La. No. 90-4443, unreported, 1991 WL 174671 (applying Louisiana law).

{¶ 14} Ohio has adopted comparative negligence for all negligence actions not covered by statute. R.C. 2315.19; *Wilfong v. Batdorf* (1983), 6 Ohio St.3d 100, 6 OBR 162, 451 N.E.2d 1185, overruled in part and modified in part on other grounds, *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489. Thus, comparative negligence is the law of Ohio in negligence cases, including professional negligence cases, where appropriate. See *Cincinnati Riverfront Coliseum, Inc. v. McNulty* (1986), 28 Ohio St.3d 333, 28 OBR 400, 504 N.E.2d 415. As to the application of the comparative negligence defense in the present case, we note that while accountants should exercise ordinary care in conducting their accounting activities, the persons who hire accountants, usually businesspersons, should also be required to conduct their business activities in a reasonable and prudent manner. *Halla Nursery, Inc. v. Baumann-Furrie*, *supra*, 454 N.W.2d at 909.

{¶ 15} Based on the foregoing, we conclude that Ohio's comparative negligence law is applicable to a client's claim against its accountant for professional negligence. Accordingly, the trial court erred in granting the motion *in limine* as to PW's comparative negligence defense and in failing to give an instruction on comparative negligence to the jury.

{¶ 16} However, despite the trial court's initial ruling granting the motion *in limine*, the record demonstrates that PW was not precluded from presenting extensive evidence tending to show that Scioto's own conduct was a cause of its losses, in addition to the negligence of PW. As the trial court noted in its decision denying PW's motion for judgment notwithstanding the verdict, "Defendant properly developed an appreciable body of evidence on the alleged acts of Plaintiff which would comprise all such affirmative defenses. These were before the jury *** to use in establishing proximate cause as defined for the jury."

**{¶ 17}** PW primarily argues about the trial court's exclusion of evidence regarding Scioto's failure to obtain business-interruption insurance. However, as the trial court noted, "the $4,000,000.00 hole in Plantiff's [*sic*] protective coverage was clearly and repeatedly presented to the jury." Moreover, failure to obtain such insurance constitutes comparative negligence only with regard to the damages attributable to the delays caused by the fire and not the other damages which the jury found Scioto to have sustained as a result of PW's negligence and breach of contract. The court of appeals recognized that the jury award improperly included damages that resulted from the fire, and ordered a remittitur to cure the error.

**{¶ 18}** Accordingly, we find that while the trial court should have allowed the comparative negligence defense, in this case the error was cured by the court of appeals' remittitur and, therefore, did not constitute prejudicial error.

**{¶ 19}** Likewise, the trial court's failure to give an instruction on comparative negligence was not prejudicial error in this case as Scioto's alleged negligence pertained mainly to the damages caused by the fire which, as we stated above, does not constitute comparative negligence. The court of appeals' remittitur properly reduced the jury award by the amount of damages attributable to the fire. Furthermore, evidence pertaining to the negligent acts of Scioto was presented to the jury during the trial. The jury was instructed that it should not award any damages to Scioto which were not caused by PW. The jury was instructed that if Scioto failed to act reasonably to avoid or reduce its losses, it could not recover any such damages. Despite these instructions, the jury still awarded Scioto all of its damages, indicating that the jury found PW the sole cause of the failure of Richmond Place. Thus, we find that even if the jury had been required to apportion the fault between the parties in this case, the outcome would have been the same. The jury found that PW was solely liable for Scioto's loss. Accordingly, since there was no prejudicial error, a new trial is not warranted.

**{¶ 20}** As to Scioto's Cross-Proposition of Law I, in which Scioto attacks the trial court's denial of prejudgment interest, we find that the trial court's order was within its discretion and will not be reversed absent an abuse of discretion. *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 203, 495 N.E.2d 572, 574. The trial court did not abuse its discretion by denying prejudgment interest in the present case as the court found that PW had an objectively reasonable belief that it had no liability. In Cross-Proposition of Law II, Scioto urges that the remittitur ordered by the appellate court be modified. However, where a party voluntarily chooses to accept a remittitur, rather than a new trial, it cannot challenge that remittitur on appeal. *Iron RR. Co. v. Mowery* (1881), 36 Ohio St. 418, paragraph three of the syllabus. This rule is fundamentally fair, as it simply binds a party to its election. *Id*.

**{¶ 21}** Finally, we do find merit in Scioto's third Cross-Proposition of Law, which contends that the court of appeals erred when it ordered post-judgment interest on Scioto's verdict to run from September 1, 1988. This was the date the *nunc pro tunc* entry was filed, which corrected a typographical error in the case number of the original judgment entry filed on August 4, 1988. Since post-judgment interest should run from the date of the original August 4, 1988 judgment entry, we reverse the court of appeals' finding on this issue and order post-judgment interest to run beginning August 4, 1988. See R.C. 1343.03(B); *In re Petition for Inquiry into Certain Practices* (1948), 150 Ohio St. 393, 38 O.O. 237, 82 N.E.2d 853, paragraph two of the syllabus.

*Judgment affirmed in part*
*and reversed in part.*

RESNICK and PFEIFER, JJ., concur.

COOK, J., concurs separately.

MOYER, C.J., DOUGLAS and WRIGHT, JJ., concur in part and dissent in part.

————————————

**COOK, J., concurring.**

{¶ 22} I concur with the judgment of the majority but dissent from the syllabus. Primarily, my disagreement is with the concept that any negligence of a client, whether or not it directly interferes with the accountant's performance, can reduce the client's recovery. I would hold, instead, that comparative negligence may be applied only to negligent acts of a client that contribute to the accountant's failure to perform according to the standards of the accounting profession. Other negligence by the client, such as the claimed negligence of Scioto here, is to be considered in the context of whether Scioto's damages proximately resulted from its own conduct as opposed to the professional negligence of Price Waterhouse. I would adopt the reasoning of the court of appeals affirming the trial court's decision not to instruct on comparative negligence in this case.

{¶ 23} I also note that although the majority finds that the trial court erred in granting the motion *in limine*, error may not be predicated on a preliminary ruling. The resulting exclusion of evidence offered at trial may be raised as error on appeal and Price Waterhouse claims such error.

---

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 24} I concur with the syllabus of the majority and the discussion in the opinion supporting the syllabus. I respectfully dissent from the judgment of the majority and the remainder of the opinion.

{¶ 25} This case involves a plethora of issues including (1) comparative negligence, (2) intervening or superseding cause, (3) judicial estoppel, (4) measure of damages, (5) prejudgment interest, (6) post-judgment interest, (7) the "two issue" rule, and (8) remittitur. Herein, I deal only with comparative negligence and judicial estoppel.

I

Comparative Negligence

**{¶ 26}** The majority properly says that "any negligence by a client, whether or not it directly interferes with the accountant's performance of its duties, can reduce the client's recovery. * * *

**{¶ 27}** "* * * Thus, comparative negligence is the law of Ohio in negligence cases, including professional negligence cases, where appropriate. * * *

**{¶ 28}** "* * * Accordingly, *the trial court erred* in granting the motion *in limine* as to PW's comparative negligence *defense and in failing to give an instruction* on comparative negligence to the jury." (Emphasis added.)

**{¶ 29}** Notwithstanding all the foregoing, the majority then finds that because PW was permitted to present "*extensive* evidence tending to show that Scioto's own conduct was a cause of its losses," the error of the trial court in granting the motion *in limine* was "cured by the court of appeals' remittitur and, therefore, did not constitute prejudicial error." (Emphasis added.)

**{¶ 30}** This is the first place that I respectfully part company from the majority. In *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585, we said that the judgment in that case "must be reversed on the grounds that the trial judge committed prejudicial error in refusing to instruct the jury on comparative negligence * * *." I recognize that it can be argued that the rule emanating from *Marshall* (that it is error not to instruct the jury on comparative negligence when the evidence dictates such a charge) was based on the particular facts of *Marshall.* However, given the unequivocal statement of the majority herein that it was error for the trial court not to give an instruction on comparative negligence, it is difficult to ignore the teachings of *Marshall* in this regard. My reason for so concluding is simple—we will never know what the jury might have decided had the jury had all the evidence before it that the granting of the motion *in limine* precluded.

II

10

Judicial Estoppel

{¶ 31} The doctrine of judicial estoppel prevents a party from staking out a position in a subsequent action that is inconsistent with a position taken in a prior action. In the case at bar, I believe that Scioto took a position that was inconsistent with a prior position taken by it in a Kentucky court.

{¶ 32} As set forth by the majority, the Richmond Place project was largely destroyed by fire on June 1, 1983. The fire, caused by a welder's torch, placed the project in serious jeopardy as to sales, revenues and competition for the existing market. At the time of the commencement of the Richmond Place project, Lexington, Kentucky, had no comparable facility.

{¶ 33} On August 13, 1984, Scioto sued its general contractor, Foster & Creighton Company ("F&C"), in a Kentucky court. In that suit, Scioto presented evidence that the negligence of F&C had caused Scioto $11.8 million in damages. The depositions of at least two of Scioto's corporate officers were taken. Each swore that the Richmond Place project was on sound financial footing prior to the fire and that the subsequent failure of the venture was attributable to the fire. Because of a liquidated damages clause in the contract between Scioto and F&C, the maximum Scioto could obtain from F&C was $1.2 million. Before trial, the parties settled for something less than the full amount.

{¶ 34} In the case at bar (the "Ohio" case), Scioto claims that the failure of the project was due to the negligence of PW and that the fire caused Scioto no more real harm in the long run. One of the same corporate officers whose deposition was taken in the Kentucky suit now says, in the Ohio case, that the value of the project was not destroyed by the fire but the project was, instead, a failure before the fire.

{¶ 35} On this point, Scioto's position in the Ohio case cannot be reconciled with its position in the Kentucky case. However, the court of appeals decided that Ohio does not recognize the doctrine of "judicial estoppel" in cases like the one now before us. I disagree.

**{¶ 36}** In *Fish v. Lake Cty. Bd. of Commrs.* (1968), 13 Ohio St.2d 99, 102, 42 O.O.2d 290, 292, 234 N.E.2d 590, 592, this court took the position that a party who had previously, in a judicial proceeding, successfully asserted one of two inconsistent substantive rights may not, in a later judicial proceeding, assert the other inconsistent right. While the term "judicial estoppel" is not used in the case, it is fair to say, I believe, that the term is descriptive of the case holding.

**{¶ 37}** If the position taken by Scioto in the Kentucky suit is to be given credence (as it was), then Scioto should not now be heard, in the Ohio case, to say something entirely different from and contradictory to the position it took in the Kentucky case. This is not just the old "two bites of the apple" theory. This is total consumption of the same apple twice—a seemingly impossible feat.

III

Conclusion

**{¶ 38}** For the foregoing as well as some additional reasons, I respectfully dissent.

MOYER, C.J., AND WRIGHT, J., concur in the foregoing opinion.

———————