BERDYCK, Appellant and Cross–Appellee,

v.

SHINDE; H.B. Magruder Memorial Hospital, Appellee and Cross–Appellant.

[Cite as *Berdyck v. Shinde* (1998), 128 Ohio App.3d 68.]

Court of Appeals of Ohio,
Sixth District, Ottawa County.

No. OT–97–050.

Decided May 29, 1998.

70

*Fritz Byers,* for appellant and cross-appellee.

*E. Thomas Maguire, Julia Smith Wiley* and *Matthew D. Harper,* for appellee and cross-appellant.

MELVIN L. RESNICK, Judge.

This is an appeal and cross-appeal from a judgment of the Ottawa County Court of Common Pleas. The issues in this case are related to the trial court's grant of appellant and cross-appellee's motion for prejudgment interest.

In March 1987, appellant and cross-appellee, Donna A. Berdyck, filed a complaint alleging that S.G. Shinde, M.D., and the employees/nursing staff of appellee and cross-appellant, H.B. Magruder Memorial Hospital ("Magruder"), had departed from accepted standards of medical care, causing her to suffer severe and permanent physical injury. She asked for five million dollars in damages.

After both Berdyck and Shinde rejected an arbitration decision, Magruder filed a motion for summary judgment in the trial court. On August 7, 1990, the trial court granted Magruder's motion. Berdyck appealed, this court reversed the judgment, and the Ohio Supreme Court affirmed our decision. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 613 N.E.2d 1014 ("*Berdyck I* "). This cause was remanded to the common pleas court in 1993 and proceeded to trial on the issues of causation and damages only.

On November 9, 1994, shortly before the jury trial commenced, Dr. Shinde entered into a settlement agreement with Berdyck. For the sum of $600,000, Berdyck released all of her claims against the physician.

At trial, the jury found in favor of Berdyck and awarded her $1.5 million. After the jury verdict, but prior to the entry of final judgment, Berdyck filed a motion for prejudgment interest of ten percent per annum on $1.5 million, dating from May 29, 1986, the date of Berdyck's injury. In its final judgment, the court deducted the $600,000 settlement and awarded Berdyck $900,000. The court denied Berdyck's motion for prejudgment interest. Berdyck filed an appeal of, among other things, the denial of this motion. Magruder filed a cross-appeal. On March 20, 1995, Magruder paid Berdyck $882,532.94.

This court reversed the trial court's denial of Berdyck's motion for prejudgment interest, finding that the trial court applied the wrong legal standard. *Berdyck v. Shinde* (Mar. 29, 1996), Ottawa App. No. OT–95–18, unreported, 1996 WL 139551, discretionary appeal not allowed (1996), 77 Ohio St.3d 1411, 670 N.E.2d 1001 (*"Berdyck II"*). The case was remanded to the trial court for the purpose of determining, "by application of the proper standard," Berdyck's motion for prejudgment interest. *Id.*

On remand, the trial court held a hearing on the motion. At the outset of the hearing, the Honorable Paul C. Moon informed the parties that his decision would rest on the evidence admitted at that hearing. Magruder did not object.

The court also considered Berdyck's motion to "reappoint" Judge Moon as the trial judge and Magruder's motion to "reinstate" the Honorable Patricia A. Gaugan, who presided over the trial and the prior hearing on appellant's motion for prejudgment interest. Gaugan was appointed to the federal bench at some point after that hearing. Judge Moon noted that such matters should be addressed by the Ohio Supreme Court. Observing his status as the sole judge of the Ottawa County Court of Common Pleas and Judge Gaugan's status as a member of the federal bench, Judge Moon stated that he was the proper judge to be hearing the matter before him and declined to rule on the motions. Judge Moon then asked whether everyone agreed to go forward with him as the trier of fact, and the parties, including Magruder, answered in the affirmative.

At the hearing, the attorneys representing each of the parties to this case testified as to the settlement negotiations over an eight-year period. Jack M. Lenavitt was the lead attorney for Berdyck. H.W. Bamman and William Pietrykowski[1] were hired by St. Paul Fire & Marine Insurance Company ("St.

1. Although St. Paul actually obtained the services of Manahan, Pietrykowski, Bamman & Delaney, these two attorneys testified at the prejudgment hearing and handled the Berdyck case.

Paul") to represent Magruder. Dr. Shinde's insurer, P.I.E. Mutual Insurance Company ("P.I.E."), engaged James M. Tuschman to represent Dr. Shinde. Judge Gaugan also testified as to her separate conversations with each of the attorneys during negotiations. Numerous documents created during negotiations were also admitted into evidence. The following facts material to our disposition of this case are derived from the foregoing evidence.

In his testimony, Lenavitt stated that he evaluated the damages recovery in this case as $2 million. Lenavitt asserted that in his thirty-two years of experience, he had never seen such a clear-cut case of causation. In a November 1987 letter to St. Paul, Pietrykowski informed the claims manager of Lenavitt's evaluation and of the fact that Lenavitt believed that the defendants' liability was shared on a fifty-fifty basis.

In May 1988, the St. Paul claims manager stated, in a report to his supervisor, that the verdict in the Berdyck case could be in the $700,000 to $1 million range with the hospital twenty-five to thirty-five percent negligent, and asked for a reserve of $250,000. St. Paul rejected this recommendation.

In November 1988, Bamman also informed St. Paul that his estimated value of the case was $1.5 million to $2 million with the hospital's exposure to liability being in the area of twenty-five percent. Bamman recommended a settlement figure of $1 million, with Magruder paying one-fourth to one-third of this amount. Nevertheless, the St. Paul claims manager believed that the verdict would never be above $400,000 to $500,000.

Tuschman's evaluation of the case was also $1.5 million to $2 million, with liability for the damages split equally between Dr. Shinde and Magruder. Tuschman believed that the case was indefensible. He initially received authority from P.I.E. to offer Berdyck $450,000, but was fairly quickly authorized to offer her $600,000.

During 1988, Tuschman, for the first time, made an offer of $900,000 to settle the entire case. P.I.E. would contribute $600,000 to that amount and Magruder would contribute $300,000. St. Paul declined, stating that a $150,000 payment on the part of the hospital "would be tops."

In December 1988, Bamman wrote to the St. Paul claims manager, stating that he believed that the case was worth $900,000 and should be settled. He further wrote that he felt Magruder's liability was $300,000 and asked for authority to offer $200,000.

In a February 1989 letter, Bamman stated that the hospital could face fifty-fifty exposure at trial. He again asked for authority to offer $250,000 to $300,00 in settlement. He received $150,000 in authority. Bamman's March 17, 1989 letter to St. Paul recommended that, due to the fact that the hospital was unable

to obtain a nursing expert to defend hospital policies, the hospital should re-evaluate its position in this case. On March 21, 1989, the hospital's expert admitted that the nursing provided to Berdyck was below the standard of care. Bamman believed that the hospital had a "lot to lose" if the case went to trial.

In April 1989, counsel learned the result of the arbitration on the issue of liability. Pietrykowski and Lenavitt agreed that no evidence of damages was presented to the mock jury or at arbitration. In addition, Dr. Shinde stipulated as to his negligence and causation in the arbitration proceedings.

Despite the results of arbitration ($1.25 million awarded to Berdyck with eighty percent of the negligence allocated to Dr. Shinde) and a mock jury trial ($1.5 million awarded to Berdyck with seventy-five percent of the negligence allocated to Dr. Shinde), Lenavitt believed that Magruder was more culpable than Dr. Shinde.

In April 1989, Berdyck's settlement demand was $900,000. Tuschman went to Lenavitt and said that Dr. Shinde was willing to settle for $600,000. He indicated that this was the limit P.I.E. would ever authorize in settlement for Berdyck's claim against the doctor. Tuschman asked Lenavitt whether Berdyck would be willing to settle the case if Tuschman could get $300,000 from Magruder. Lenavitt and his client said "yes." However, even though Bamman had consistently stated that the case was worth $900,000 and that the hospital should settle for $300,000 of that amount, the St. Paul claims manager, relying on the division of liability determined in arbitration, instructed Bamman to offer Berdyck $150,000, twenty percent of $750,000. According to Tuschman, P.I.E. then refused to increase its offer because it did not want "to run [its] numbers up while he [Bamman] wasn't moving at all."

In June 1989, Berdyck made a $1.2 million demand. In his history of the course of negotiations, the claims manager noted that Dr. Shinde wanted to offer Berdyck $800,000 with Shinde paying $500,000 and Magruder the remaining $300,000. While the claims manager found the split of the payment encouraging because it showed that Dr. Shinde's counsel was moving away from an equal-responsibility position, he believed that agreeing to pay $300,000 might cause Shinde to solidify his position and refuse to pay any more than $500,000 in the future.

Throughout the remainder of 1989, St. Paul's offer was $150,000. Trial was scheduled for April 23, 1990. In February 1990, Bamman again recommended offering $300,000 to Berdyck. While observing that Bamman was not anxious to try the case, the St. Paul claims manager advised that they again offer the plaintiff $150,000. He did request authority in the amount of $200,000. At an April 2, 1990 settlement conference, the hospital offered Berdyck $180,000 to settle her claim. Berdyck announced that her lowest figure for settlement was

still $900,000. Dr. Shinde's attorneys informed the St. Paul claims manager of the fact that the medical board at P.I.E. had voted to contribute two-thirds of the settlement funds but no more than $600,000. Shortly thereafter, the St. Paul claims manager sought, and received, authority to offer up to $225,000 in settlement.

Subsequently, the trial court judge revealed the $225,000 amount to Berdyck; therefore, on April 11, 1990, Magruder/St. Paul extended an offer in that amount. The trial was continued, and Berdyck failed to accept the offer.

In June 1990, Magruder filed a motion for summary judgment based largely on the recent Ohio Supreme Court case of *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 553 N.E.2d 1038, overruled on other grounds in *Clark v. Southview Hosp. & Family Health Ctr.* (1994), 68 Ohio St.3d 435, 628 N.E.2d 46. The trial court granted the motion for summary judgment. Berdyck appealed.

Tuschman testified that at this point he became very concerned because he believed that Magruder would not negotiate a settlement while the case was on appeal. Due to the length of time involved in resolving the case, he was also disturbed about the issue of prejudgment interest. In an August 1990 letter, he told Lenavitt that P.I.E. was willing to advance Berdyck $200,000 from any future judgment or settlement in exchange for Berdyck's willingness to waive prejudgment interest as to Shinde. Berdyck agreed to this proposal. During earlier negotiations, P.I.E. made a standing offer to Berdyck that would allow her to draw up to the $600,000 limit set by P.I.E. without signing a release of her claims against Dr. Shinde. She had declined to take advantage of the previous offer.

In his report dated November 13, 1990, the claims manager stated that Berdyck had a new motor vehicle and said that counsel recommended determining whether Berdyck and Dr. Shinde had effected a settlement agreement. A February 1991 note indicated that such an agreement was in effect; however, in June 1992, Dr. Shinde's counsel notified St. Paul that it had not settled with Berdyck and would proceed to trial.

After this court's reversal of the trial court's judgment was affirmed by the Ohio Supreme Court, St. Paul was willing to settle the case for $250,000. P.I.E. still believed that the settlement value of the case was $900,000 but wanted Magruder/St. Paul to pay one-half of this amount. Berdyck rejected the $250,000 offer and demanded a package settlement of $2 million.

On November 9, 1994, at a settlement conference, Pietrykowski informed Judge Gaugan that he suspected Shinde and Berdyck had reached a settlement agreement. She questioned Lenavitt and Tuschman separately. Lenavitt said yes; Tuschman said no. However, on that same date, Berdyck and Dr. Shinde

did eventually enter into a settlement agreement. Berdyck released her claims against the doctor in exchange for $600,000. Magruder also learned of the $200,000 advance at this time.

Berdyck then demanded $600,000 from Magruder, to be paid by 5:00 p.m. on that day. Magruder offered her $300,000. In the four weeks before trial, Berdyck increased her demand to $750,000, then to $2 million. On the morning of trial, Berdyck reduced her demand to $900,000. Magruder/St. Paul's offer remained at $300,000. During jury deliberations, the hospital indicated that it might raise its offer to $400,000, but Berdyck refused and again demanded $2 million.

Testimony revealed that Berdyck's attorney, Jack Lenavitt, went along with some kind of joint settlement until November 1994, stating his reasons as follows:

"I suppose I have said it, but what I would like to emphasize is that I couldn't let either of the defendants go because of the horrible prospect of one defendant blaming the other, precisely what happened when I extricated Jim's client [Dr. Shinde]. St. Paul, through Mr. Pietrykowski, spent the whole trial blaming Dr. Shinde."

The record discloses St. Paul's position throughout the history of this case was that Dr. Shinde bore the greater responsibility for Berdyck's injuries. Despite the fact that counsel for the hospital was unable to obtain a nursing expert to testify that the nursing care provided to Berdyck met the standard of care for the nursing profession and a Ohio Supreme Court decision articulating a more stringent standard of care for Ohio nurses, Bamman used the causation defense throughout this entire case.

The case history detailed by the St. Paul claims manager also reflects the importance of this defense to the hospital's insurer. In addition, the record shows that St. Paul relied heavily on the results of the arbitration to determine the extent of its liability during settlement negotiations.

Pietrykowski testified that his understanding throughout negotiations was that P.I.E. would never accept anything but a two-thirds to one-third split payment of a settlement amount between the doctor and the hospital, respectively. After the remand from the Ohio Supreme Court, Pietrykowski concentrated on the damages aspect of case. He also felt that the hospital had a viable defense with causation and "empty chair defendant [Shinde]." Believing that Berdyck could not prove substantial injury, the insurance company also focused on the amount of damages it thought she could recover.

While Pietrykowski thought that the plaintiff's November 1994 agreement with Shinde "substantially hindered" Berdyck's negotiations with the hospital because of less motivation to settle, he also testified that the earlier agreement with Dr.

Shinde to advance funds to Berdyck probably had no effect on the ability to settle in 1989 and 1990. Pietrykowski did state, nonetheless, that the earlier agreement gave Berdyck a cushion, just as it would in any other case where one defendant settles out.

Tuschman believed that after the arbitration results, the hospital and St. Paul "were simply going to lay back, assuming that because we had the major exposure [in those results], that we pay whatever we had to pay to get out of this case and extricate them * * *." In Tuschman's opinion, St. Paul appeared to be in a contest with P.I.E. and was determined "to make sure they paid a lot less than P.I.E. regardless of what the facts of the case were." When the Ohio Supreme Court affirmed this court's reversal of the trial court's judgment, it articulated a new standard of care for nurses that, according to Tuschman, strengthened his position of "equal responsibility." Therefore, after the remand, he took the position that settlement must be fifty-fifty.

On May 27, 1997, the common pleas court entered extensive findings of fact and conclusions of law. In its conclusions of law, the court expressly found that Berdyck negotiated for a settlement in good faith and that Magruder did not negotiate in good faith. The court held that Berdyck was entitled to prejudgment interest. In a September 10, 1997 decision, the court opted to calculate the prejudgment interest at a rate of ten percent per annum from June 30, 1993, the date of the remand of this case from the Ohio Supreme Court. On October 14, 1997, the common pleas court entered final judgment awarding Berdyck $150,-812.39 as prejudgment interest.

Berdyck appealed this judgment and Magruder cross-appealed. We shall first consider the hospital's cross-appeal.

Magruder's assignments of error on cross-appeal are:

"By remanding this case for further proceedings, this court erred in failing to apply the abuse of discretion standard to the trial court. [This court erred in] deciding that the trial court had failed to follow the law and in deciding there was an additional standard in determining whether Magruder had exercised good faith during settlement negotiations."

"The lower court abused his discretion in not recusing himself because of conflict of interest, in holding a prejudgment interest hearing de novo and not questioning the trial judge about her prejudgment interest conclusion of no bad faith, and in not permitting her to testify in full about settlement negotiations."

"The lower court abuse[d] its discretion by failing to conclude that Berdyck negotiated without good faith."

"The lower court abused its discretion by failing to conclude that Magruder negotiated in good faith."

"The lower court abuse[d] its discretion by failing to follow the law when it awarded prejudgment interest."

■ Magruder's first cross-assignment of error is simply an untimely request for reconsideration of our final judgment in the appeal of *Berdyck II*. See App.R. 26(A). Therefore, our decision in *Berdyck II* remains the law of the case on the legal questions involved for all subsequent proceedings at both the trial and reviewing levels. *Hubbard v. Sauline* (1996), 74 Ohio St.3d 402, 404, 659 N.E.2d 781, 783–784. Accordingly, Magruder's first cross-assignment of error is found not well taken.

The gist of Magruder's second assignment of error is that the trial court abused its discretion in holding a *de novo* hearing on the issue of prejudgment interest and in the manner in which the court conducted that hearing.

■ With regard to the holding of a new hearing, Magruder never objected to either the hearing itself or Judge Moon's decision not to review the transcript of the first hearing and Judge Gaugan's findings of fact and conclusions of law. A litigant's failure to raise an issue in the trial court waives the litigant's right to raise that issue on appeal. *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 462–463, overruled on other grounds in *Collins v. Sotka* (1998), 81 Ohio St.3d 506, 692 N.E.2d 581. Thus, this court need not consider any assertion related to the holding of the hearing itself.

Moreover, Magruder seems to believe that this court's prior decision has no force and effect. That is, Magruder asserts that Judge Moon should have questioned Judge Gaugan as to whether, in *Berdyck II*, she applied the proper legal standard in denying Berdyck's motion for prejudgment interest. According to Magruder, if the judge indicated that she did apply the proper standard, "that should have been the end of the second prejudgment interest proceedings." Again, this court determined that Judge Gaugan applied the wrong legal standard in *Berdyck II*. That determination is now the law of the case. Judge Gaugan's opinion on this issue was therefore irrelevant and would not have precluded the second hearing on Berdyck's motion for prejudgment interest.

Magruder's second assignment of error also addresses Judge Moon's alleged abuse of discretion in failing to recuse himself from this case due to a conflict of interest.

■ Judge Moon originally recused himself from this case because his wife was, at one time, Dr. Shinde's patient. Visiting judges, including Judge Gaugan, were appointed to preside over this case by the Ohio Supreme Court. However, after our remand on the prejudgment interest issue, Dr. Shinde was not a party to this case. Therefore, Judge Moon determined that a conflict of interest no longer existed. If Magruder did not agree with the trial court, its remedy was to

file an affidavit of interest, bias, prejudice, or disqualification with the Clerk of in the Ohio Supreme Court. R.C. 2701.03. There is no suggestion that Magruder ever filed such an affidavit.

 Furthermore, only the Chief Justice of the Ohio Supreme Court or his designee has the authority to pass upon the disqualification of a common pleas court judge. *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 8 O.O.3d 438, 377 N.E.2d 775; *State v. Dougherty* (1994), 99 Ohio App.3d 265, 650 N.E.2d 495. Thus, a court of appeals is without authority to render a decision as to disqualification or to void a trial court's judgment on this basis.[2] *State v. Dougherty*, 99 Ohio App.3d at 269, 650 N.E.2d at 498.

Next, Magruder contends that the trial court abused its discretion by not allowing Judge Gaugan to testify to all of the settlement negotiations rather than limiting her testimony to conversations she had had with each attorney privately.

 Trial courts have broad discretion in the admission or exclusion of evidence. *State v. Dunlap* (1995), 73 Ohio St.3d 308, 316, 652 N.E.2d 988, 996. The trial court's decision regarding the admission or exclusion of relevant evidence will not be disturbed on appeal unless it is clear that the decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

 In the present case, the trial court did not abuse its discretion in limiting Judge Gaugan's testimony. The court had before it depositions, numerous exhibits, and the testimony of the attorneys who participated in the settlement negotiations. As the trier of fact, it was Judge Moon's duty to determine the weight of that evidence and the credibility of those witnesses. Judge Gaugan's opinion regarding these matters was, therefore, irrelevant.

For these reasons, Magruder's second cross-assignment of error is found not well taken.

In its third and fourth cross-assignments of error, Magruder asserts that the trial court abused its discretion in determining that Berdyck made a good faith effort to settle with the hospital and that the hospital did not make a good faith effort to settle.

At the time the motion for prejudgment interest was filed in this case, R.C. 1343.03(C) provided:

---

2. To the extent that Magruder argues that Judge Gaugan should have been reappointed to this case, we again point out that Judge Moon had no authority to "reinstate" Judge Gaugan. Under the Ohio Constitution, only the Chief Justice of the Ohio Supreme Court has the authority to assign judges to duty in other courts and counties. *In re Disqualification of Hunter* (1996), 77 Ohio St.3d 1242, 674 N.E.2d 354.

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

To award prejudgment interest, the trial court must find that the party required to pay the judgment failed to make a good faith effort to settle the case and that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 658, 635 N.E.2d 331, 347–348. In the prejudgment interest context, the Ohio Supreme Court has developed a standard of good faith composed of (1) full cooperation in discovery proceedings, (2) rational evaluation of risks and potential liability, (3) unnecessary delay of the proceedings, and (4) a good faith settlement offer or response in good faith to an offer from the other party. *Id.,* citing *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus. Furthermore, a party possessing a good faith, objectively reasonable belief that he has no liability need not make a settlement offer. *Id.* at 658–659, 635 N.E.2d at 347–348.

The party seeking prejudgment interest bears the burden of proof. *Id.* at 659, 635 N.E.2d at 348. In proving its good faith settlement effort, and a lack of good faith by the opposing party, it is incumbent on a party seeking an award to present persuasive evidence of an offer to settle that was reasonable when "considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle. Other factors include responses, or lack thereof, and a demand substantiated by facts and figures." *Id.* A subjective claim of lack of good faith will usually not be sufficient. *Id.*

The determination to award prejudgment interest rests within the trial court's sound discretion. *Scioto Mem. Hosp. Assn., Inc. v. Price Waterhouse* (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268, 1273–1274. Absent a clear abuse of discretion, the trial court's finding on this issue will not be reversed. *Kalain v. Smith,* 25 Ohio St.3d at 159, 25 OBR at 202–203, 495 N.E.2d at 573–574. The Ohio Supreme Court defines "abuse of discretion" as an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126–127, 482 N.E.2d 1248, 1251–1252. An abuse of discretion involves far more than a difference in

opinion. "In order to have an 'abuse' in reaching a determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *Id.*

Magruder contends that the evidence clearly demonstrated that Berdyck delayed in proceeding to trial and that her conduct "was a lack of good faith."

First, Magruder argues that the trial court should have determined that Dr. Shinde and Berdyck entered into a secret "Mary Carter" agreement. The trial court, in its judgment, determined that any agreement between Shinde and Berdyck was not a Mary Carter agreement.

A "Mary Carter" agreement is "a contract between a plaintiff and one defendant allying them against another defendant *at trial*." (Emphasis added.) *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 93, 566 N.E.2d 154, 156. A Mary Carter agreement may have a variety of terms, but generally has the following provisions: (1) the settling defendant guarantees the plaintiff a minimum payment, regardless of the judgment; (2) the plaintiff agrees not to enforce judgment against the settling defendant; and (3) the settling defendant remains a party in the trial, but its exposure is reduced in proportion to any increase over that agreed amount in the liability of the other codefendants. Sometimes the agreements are kept secret. *Id.* at 93, 566 N.E.2d at 157, fn. 1.

We conclude that the trial court did not err in finding that the agreement between Berdyck and Shinde was not a Mary Carter agreement. First, there is absolutely no evidence in the record of this case to show that Berdyck ever agreed not to enforce any judgment obtained against Dr. Shinde. Second, one of the major dangers of a Mary Carter agreement is the change in the relationship between the plaintiff and the settling defendant. *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 17, 615 N.E.2d 1022, 1029–1030, overruled, in part, on other grounds in *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502. The settling defendant remains a nominal defendant in the trial while secretly conspiring to aid the plaintiff's case. *Id.* That defendant's exposure to liability is reduced in proportion to any increase in liability of the remaining defendant over the agreed upon amount. *Id.* at 16, 615 N.E.2d at 1028–1029. Here, the early offer of up to a $600,000 advance was not accepted by Berdyck. The agreement under which Berdyck received $200,000 in return for relinquishing the right to seek prejudgment interest did not relieve Dr. Shinde of the incentive to keep the damages down at trial because he would have, in all likelihood, paid, by his counsel's own estimate, at least one-half of the $1.5 million verdict, or $750,000. The fact that Dr. Shinde "remained at risk of liability in a

significant amount is indicative of the lack of collusive purpose in executing" the $200,000 agreement. *Id.*

Moreover, the pattern of demands for settlement are not reflective of any "Mary Carter" agreement. Rather, they are natural fluctuations caused by matters learned in discovery, the grant of Magruder's motion for summary judgment, the Ohio Supreme Court's enunciation of a nursing standard, settlement with Dr. Shinde, trial, the stance of the two insurance companies involved, and counsel's strategies.

Appellant next maintains that Berdyck's insistence on a package settlement demonstrated lack of good faith as a matter of law. Appellant cites two appellate cases as authority for this proposition. See *Black v. Bell* (1984), 20 Ohio App.3d 84, 20 OBR 105, 484 N.E.2d 739; *Hanratty v. Huron Rd. Hosp.* (Aug. 13, 1987), Cuyahoga App. No. 52525, unreported, 1987 WL 15657.

In *Black v. Bell,* the same attorney represented two plaintiffs, the injured driver of a motor vehicle and his passenger. *Id.,* 20 Ohio App.3d at 85, 20 OBR at 105–106, 484 N.E.2d at 740–741. Undisputed testimony from defense counsel revealed that the plaintiffs' attorney consistently insisted that any settlement must be a joint settlement with both plaintiffs. *Id.* at 86, 20 OBR at 106–107, 484 N.E.2d at 741. Additionally, no evidence was offered by the plaintiffs to show that they met the standard employed by the Eighth Appellate District in determining whether these plaintiffs made a good faith effort to settle. *Id.* As part of its decision affirming the trial court's denial of prejudgment interest, the *Black v. Bell* court set forth the following holding:

"Anyone who requires joint settlement *for* multiple unrelated parties presumably fails to make good faith negotiation efforts. Inability to agree on settlement of any single claim would then preclude settlement of all consolidated claims." (Emphasis added.) *Id.* at 89, 20 OBR at 110, 484 N.E.2d at 744.

The reasoning behind the statement, however, reveals that the court was concerned with ethical considerations, specifically, a conflict of interest, when a single attorney represents multiple plaintiffs. *Id.* This case does not involve the same attorney representing multiple plaintiffs. Thus, it is readily distinguishable from *Black v. Bell.* Further, the wording of the holding in *Black v. Bell* limits that holding to the circumstances occurring in that case. That is, the holding requires joint settlement *for* multiple parties, indicating that it applies only to a single attorney's representing more than one plaintiff or defendant's demanding a package settlement for those plaintiffs or defendants.

*Hanratty* is a case very similar to the one before us. The injured party in that case died after bypass heart surgery. In the resulting negligence action (medical claim) against the hospital and anesthesiologist, the plaintiff was awarded $800,-

000 and prejudgment interest. On appeal, the hospital asserted, among other things, that the plaintiff failed to negotiate in good faith by requiring a "package settlement." The *Hanratty* court cited *Black v. Bell* in stating: "[A] party who requires joint settlement for multiple unrelated parties fails to negotiate in good faith." However, the *Hanratty* court omitted the key word "presumably" from its holding and failed to consider the factual differences between the case before it and the *Black v. Bell* case. Therefore, we find *Hanratty* unpersuasive.

Moreover, even if the holding in *Black v. Bell* is taken at its broadest, Berdyck presented sufficient evidence to overcome any "presumption" that a demand for joint settlement constituted a lack of good faith on her part. The record shows that Dr. Shinde, more than Berdyck, insisted on a joint settlement. Berdyck did, in fact, settle with one of the defendants prior to trial. Furthermore, Lenavitt's testimony disclosed that Magruder used the same tactic at trial that, in the event of settlement with one defendant, he feared the most. That is, Magruder's emphasis in the case was causation and, during trial, its defense was that Dr. Shinde bore the greater responsibility for Berdyck's injury. If believed by the jury, Magruder could obtain a verdict in its favor or one corresponding with St. Paul's estimate of the hospital's liability. Therefore, unlike *Black v. Bell,* and to the extent that he did request a joint settlement, Berdyck's counsel did not have a conflict of interest, but engaged in a reasonable tactic to protect his client's interest.

Upon a careful review of the record and the trial court's judgment, we find, in consideration of the factors articulated by the Ohio Supreme Court, that the trial court did not abuse its discretion in finding that Berdyck made good faith efforts to settle this case.

 Magruder fails to offer any new arguments in support of its allegation that the trial court abused its discretion in finding that the hospital failed to make good faith efforts to settle this case. Our review indicates that Magruder/St. Paul did not fairly and rationally evaluate its potential liability in this case. Based on the evidence divulged through discovery and the law, Magruder could not have had a good faith, objectively reasonable belief that it had no liability. Rather than listening to an experienced attorney or considering the results of the appeal of the grant of its summary judgment motion, the hospital chose to continue to rely on the arbitration decision to determine its share of responsibility. Even when the hospital's attorney valued this case at between $1.5 million and $2 million and admitted that he could not find an expert to testify that nursing standards were met in the care of Berdyck, St. Paul continued to undervalue the case and to focus on the alleged culpability of Dr. Shinde. This stance led to St. Paul's refusal to respond to Berdyck's settlement offers.

Accordingly, we cannot say that the trial court abused its discretion in finding that Magruder/St. Paul failed to make a good faith effort to settle this action.

Magruder's third and fourth cross-assignments of error are found not well taken.

Magruder's fifth cross-assignment of error challenges the propriety of the application of R.C. 1343.03(C). Magruder notes that the trial court correctly determined that Magruder could rely on the law as it was prior to the Ohio Supreme Court's decision in *Berdyck I*. Therefore, the court held that prejudgment interest would be assessed only from June 30 1993, the date of remand to the trial court. Magruder reasons that the remand date is not an event that triggers the application of R.C. 1343.03(C). Consequently, Magruder argues that the common pleas court violated Magruder's constitutional rights by finding the statute applicable to this case. Because we find, as discussed below, that the trial court erred in its selection of June 30, 1993 as the date from which prejudgment interest began to run, Magruder's fifth cross-assignment of error is rendered moot.

Appellant, Donna Berdyck, sets forth the following assignments of error:

"The trial court erred to Ms. Berdyck's prejudice in ordering that defendant pay prejudgment interest only for the period between the date of remand and the date on which St. Paul paid the judgment."

"The trial court erred to the prejudice of plaintiff in failing to compound interest in calculating the amount of prejudgment interest to be awarded to plaintiff."

In her first assignment of error, Berdyck contends that the award of prejudgment interest should run from May 29, 1986, the date of her injury, until the date the judgment was paid.

■■■ R.C. 1343.03(C) states that an award of prejudgment interest "shall be computed from the date the cause of action accrued to the date on which the money is paid." This provision is mandatory and may not be adjusted for equitable reasons. *Musisca v. Massillon Community Hosp.* (1994), 69 Ohio St.3d 673, 635 N.E.2d 358, syllabus. Here, however, Magruder claims that the trial court's choice of June 30, 1993 as the date from which prejudgment interest should be calculated was based on the constitutional ban of retroactive statutes.

Initially, we note that the version of R.C. 1343.03(C) applicable to this case was effective on July 5, 1982, almost four years prior to the time of Berdyck's injury. Thus, it is not the retroactivity of the statute that is at issue in this case. Rather, the question is whether the grant of summary judgment to Magruder in 1990 supplanted May 29, 1986 with June 30, 1993 (the date of remand from the Ohio

Supreme Court after reversal of the grant of summary judgment) as the date from which prejudgment interest should accrue. Magruder recognizes that this is the real issue by arguing that prior to the Ohio Supreme Court's decision in *Berdyck I,* the hospital was the "prevailing" party with a judgment in its favor.

Generally, the Ohio Supreme Court's decisions apply retrospectively, and "the effect is not that the former was bad law, but that it never was law." *Peerless Elec. Co. v. Bowers* (1955), 164 Ohio St. 209, 210, 57 O.O. 411, 411, 129 N.E.2d 467, 468. The one exception to this rule is where contractual rights have arisen or vested rights have been acquired under the prior decision. *DeRolph v. State* (1997), 78 Ohio St.3d 419, 420, 678 N.E.2d 886, 887, citing *Peerless Elec. Co. v. Bowers,* 164 Ohio St. at 210, 57 O.O. at 411, 129 N.E.2d at 468.

In the case under consideration, *Berdyck I* modified and reversed, in part, the law, *Albain v. Flower Hosp.,* relied on by Magruder in its motion for summary judgment. Of equal importance is the fact that *Berdyck I* reversed the grant of summary judgment to Magruder. Accordingly, that law never existed. Magruder had no demonstrable contractual or vested right acquired under either *Albain* or *Berdyck I.* Therefore, the trial court was required to award prejudgment interest from the other proposed date of accrual of Berdyck's cause of action, *i.e.,* May 29, 1986. Accordingly, Berdyck's first assignment of error is found well taken.

In her second assignment of error, Berdyck contends that the trial court erred in calculating the prejudgment interest by using the simple interest method. She asserts that R.C. 1343.03(C) does not denote the method to be used and that, considering the purpose of the statute, the interest should be computed as compound interest.

Simple interest is to be used when there is no specific agreement to compound interest or a statutory provision authorizing the compound interest. *State ex rel. Elyria v. Trubey* (1984), 20 Ohio App.3d 8, 20 OBR 8, 484 N.E.2d 169, *Viock v. Stowe–Woodward Co.* (1989), 59 Ohio App.3d 3, 569 N.E.2d 1070; *Leber v. Buckeye Union Ins. Co.* (July 18, 1997), Erie App. No. E–96–014, unreported, 1997 WL 416353, discretionary appeal allowed in (1997), 80 Ohio St.3d 1436, 685 N.E.2d 545, appeal dismissed in (1998), 84 Ohio St.3d 1423, 702 N.E.2d 433. In the present case, there was no agreement among the parties to compound interest nor is there any statutory provision that would permit the interest to be compounded. Consequently, Berdyck is entitled only to simple interest on her judgment.

Berdyck argues, however, that the cited cases involve the award of post-judgment interest and offers several of the public policy reasons underlying an injured party's right to prejudgment interest from a tortfeasor to support her

argument that she is entitled to compound interest. Nevertheless, our research discloses that the Ohio Supreme Court has not addressed this issue and that, possibly, no appellate court, including our own, has determined whether any other rate, including compound interest, is applicable to prejudgment interest awarded under R.C. 1343.03(C). But, see, *Williams v. Colejon Mechanical Corp.* (Nov. 22, 1995) Cuyahoga App. No. 68819, unreported, 1995 WL 693129 (finding that prejudgment interest in a contract case could not be compounded).

Instead, it has long been held that the rate of interest on judgments arising from tort cases is the statutory rate. *Calahan v. Babcock* (1871), 21 Ohio St. 281, 1871 WL 61; *State Auto. Mut. Ins. Co. v. Kaffenberger* (1948), 84 Ohio App. 304, 39 O.O. 424, 83 N.E.2d 916. The statutory rate in this case is ten percent per annum. See R.C. 1343.03(A). In *Musisca,* the Ohio Supreme Court, without comment, affirmed a trial court judgment awarding the plaintiff prejudgment interest at the rate of ten percent per annum. *Id.,* 69 Ohio St.3d at 676, 635 N.E.2d at 360. This court has also affirmed cases in which the trial court awarded the plaintiff prejudgment interest at ten percent per annum. See, *e.g., Pheils v. Palmer* (Aug. 29, 1997), Lucas App. No. L–96–176, unreported, 1997 WL 543051; *Sanderson v. Ohio Edison Co.* (Nov. 1, 1996), Ottawa App. No. OT–96–022, unreported, 1996 WL 629478. In fact, Berdyck's motion for prejudgment interest specifically requested an award of prejudgment interest at ten percent per annum. "Interest contained in the statement 'with interest at the rate * * * per annum' generally means interest is from date at a simple rate per annum until paid." *Trebmal Constr., Inc. v. Sherway Application Co.* (Feb. 7, 1991), Cuyahoga App. No. 58033, unreported, 1991 WL 12995, citing *Gruhler v. Hossafaus* (P.C. 1963), 93 Ohio Law Abs. 71, 28 O.O.2d 477, 195 N.E.2d 387. Accordingly, we reject Berdyck's arguments and find her second assignment of error not well taken.

The judgment of the Ottawa County Court of Common Pleas is affirmed in part and reversed in part. This cause is remanded to the trial court for the calculation of ten percent per annum simple interest on $900,000,[3] dating from May 29, 1986 to March 20, 1995. H.B. Magruder Memorial Hospital is ordered to pay the costs of this appeal and cross-appeal.

Magruder requested, in the alternative, that this court certify our decision to the Ohio Supreme Court as being in conflict with *Black v. Bell* and *Hanratty, supra.*

---

[3]. The $900,000 was determined to be the amount of the judgment awarded to Berdyck against Magruder in *Berdyck II.*

In order to qualify for certification to the Supreme Court of Ohio pursuant to Section 3(B)(4), Article IV of the Ohio Constitution, a case must meet the following three conditions:

"First, the certifying court must find that its judgment is in conflict with the judgment of a court of appeals of another district and the asserted conflict *must* be 'upon the same question.' Second, the alleged conflict must be on a rule of law—not facts. Third, the journal entry or opinion of the certifying court must clearly set forth the rule of law which the certifying court contends is in conflict with the judgment on the same question by other district courts of appeals." (Emphasis *sic.*) *Whitelock v. Gilbane Bldg. Co.* (1993), 66 Ohio St.3d 594, 596, 613 N.E.2d 1032, 1034.

We have already distinguished *Black v. Bell, supra,* from the instant case. In *Hanratty,* the plaintiff apparently negotiated for a package settlement that required the hospital-defendant to "pay essentially the 'full value' of the case." That did not happen in the case before us. Moreover, the mention of the rule in *Black v. Bell* was simply *dicta* because the *Hanratty* court found that it was inapplicable, due to a lack of evidence, to the case before it. Finally, in *Hanratty,* the court looked to *Black v. Bell* for its "rule of law" and then misstated that rule. We have previously discussed the fact that Berdyck overcame the presumption, if any, set forth in the latter case. For these reasons, we do not believe that our holding in this case on the issue of Berdyck's good faith in settlement negotiations is in conflict with any "rule" provided in either of the cited cases. Accordingly, Magruder's request to certify this case to the Ohio Supreme Court is denied.

*Judgment affirmed in part*
*and reversed in part.*

HANDWORK, P.J., and GLASSER, J., concur.