Docket No. 94676–Agenda 10–May 2003.

THE BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT No. 508, County of Cook, Appellee, v. COOPERS &   LYBRAND, Appellant.

Opinion filed December 18, 2003.

JUSTICE KILBRIDE delivered the opinion of the court:

The Board of Trustees of Community College District No. 508 (Board) sued the accounting firms of Coopers & Lybrand (Coopers) and Arthur Andersen (Andersen). The Board sought more than $50 million in compensatory damages, allegedly resulting from the failure of those firms to discover and report to the Board inappropriate investments made by Phillip R. Luhmann, the treasurer and chief financial officer of City Colleges of Chicago (City Colleges). The Board sought damages in tort from both Andersen and Coopers, jointly and severally, and also sought damages resulting from breach of contract from both firms. Prior to trial, Andersen settled with the Board and the Board filed an amended complaint seeking relief against only Coopers. The jury found damages on the tort claim in the amount of $23 million, reduced to $12.65 million because of the Board’s contributory fault. The jury also awarded damages on the Board’s contract claim. Both parties appealed.

The appellate court affirmed. 333 Ill. App. 3d 225. We granted Coopers’ petition for leave to appeal (177 Ill. 2d R. 315), and the Board seeks cross-relief (155 Ill. 2d R. 318). We granted the American Institute of Certified Public Accountants leave to file a brief as 
amicus curiae
 in support of Coopers. 155 Ill. 2d R. 345. We now affirm in part and reverse in part, and remand the cause to the trial court with directions.

I. BACKGROUND

The Board is a body politic and corporate created under the Public Community College Act (110 ILCS 805/1–1 
et seq.
 (West 1994)). The Board operates and manages the City Colleges of Chicago. City Colleges is a public agency and its investment policies must comply with the Public Funds Investment Act (Investment Act) (30 ILCS 235/1 
et seq.
 (West 2002)). Accordingly, in 1988, 1990, and 1992, the Board adopted resolutions authorizing its treasurer to invest City Colleges’ funds only in instruments permitted by the Investment Act. The resolutions provided that the funds should be invested only in securities guaranteed as to payment of principal and interest by the full faith and credit of the United States of America. The securities were required to be of a type that would mature or be redeemable before funds were needed, in the opinion of the treasurer, to provide for the Board’s expenditures. The investment policy directed that securities should generally be purchased with the intent of holding to maturity so as to minimize interest rate risk. Despite this clear mandate, the treasurer, Luhmann, invested in securities not authorized by the resolutions. Further, he repeatedly engaged in a practice known as “pairing off” securities, buying a security and expecting to sell it for a profit before he was required to pay for it.

In February 1994, the Board chairman, Ron Gidwitz, learned that Luhmann had violated the City Colleges’ investment policy and declared a “financial emergency.” Luhmann was terminated, and the Board instructed City Colleges to sell the securities that did not comport with the investment policy as soon as prudently possible.

In its original complaint, the Board alleged that during fiscal years 1991, 1992, and 1993, Luhmann invested in securities not authorized by the Board’s investment policy and in violation of the Investment Act. Andersen audited City Colleges’ financial statements for the fiscal years 1991 and 1992. Coopers audited the financial statements for fiscal year 1993. The complaint alleged that the failure of the auditors to identify and report Luhmann’s investment policy violations to the Board amounted to a breach of each firm’s duty to comply with generally accepted accounting procedures. The Board claimed that if it had been informed of the investment policy violations, it would have taken steps to respond and avoided a dramatic decline in the value of the securities, claimed to be in excess of $50 million and not discovered until 1994. Thus, the conduct of both accounting firms was alleged to be the proximate cause of City Colleges’ financial losses, and the prayer for relief sought recovery against both firms, jointly and severally.

Although Luhmann’s investment policy violations occurred throughout the fiscal years in question, the investments resulting in the precipitous losses were not made until both Andersen and Coopers had completed their audits. Thus, the gravamen of the complaint was that if either auditing firm had informed the Board that the securities in the City Colleges’ portfolio violated its investment policy, the Board would have ended those investment practices. Hence, the later investments that ultimately resulted in the claimed losses would not have occurred.

Andersen and the Board settled prior to trial. The trial court found the settlement to be in good faith. The Board filed an amended complaint, deleting all references to Andersen and the 1991 and 1992 audits, but identical in all other respects to the original complaint.

Coopers asserted the affirmative defense of comparative fault. However, prior to trial, the court ruled that pursuant to the “audit interference” doctrine, only conduct by the Board affecting Coopers’ preparation of the audit could be considered. Thus, Coopers was not permitted to argue that extensive evidence of the Board’s oversight of Luhmann’s investment activities and its knowledge of possible violations of investment policy supported a finding of contributory fault.

At trial, Board chairman Ronald Gidwitz testified that Luhmann furnished the Board with regular summaries of the current status of City Colleges’ investments at various times during the fiscal year. Five reports were furnished during fiscal year 1993, showing the investments Luhmann had made, including treasury, Government National Mortgage Association (GNMA) Securities, and other agency mortgage-backed securities. The reports reflected wide fluctuations in securities from quarter to quarter, indicating that securities were not being held to maturity. No objection was raised by the Board to this practice.

Gidwitz admitted that he knew some mortgage-backed securities were not being held to maturity. He testified that Luhmann told him he had sold treasury bonds prior to maturity. He admitted making “mental notes” of these matters, intending to discuss them with Luhmann, but he never spoke with either Luhmann or Coopers about any investment noncompliance.

On October 9, 1993, shortly before the audit was concluded, Luhmann told Coopers that there had been no significant change in the investment portfolio since June 30, 1993. At another meeting, Luhmann and City Colleges’ acting controller, Michael Wagner, represented to the auditors that there had been no significant events or transactions since the fiscal year-end that should be considered for inclusion or disclosure in the financial statements and that there were no significant new commitments or contingencies since the end of the fiscal year. Despite these representations, Luhmann testified at trial that City Colleges’ portfolio changed after June 1993, a fact confirmed by Coopers’ expert witness, Professor John McConnell.

City Colleges also furnished Coopers with a representation letter dated October 15, 1993, signed by Wagner, stating that City Colleges was not aware of any “violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency” and that “no matters or occurrences have come to our attention to the date of this letter that would materially affect the financial statements and related disclosure for the year ended June 30, 1993.” Gary Seidelman, Coopers’ engagement partner, testified that Coopers delivered its audit report on October 16, 1993, and that it would not have done so without the representation letter in hand.

The jury heard expert testimony regarding the financial losses caused by Luhmann’s investment practices. Dr. Lisette Cooper, the Board’s expert, attributed nearly $65 million in losses to Coopers’ failure to monitor compliance with the investment policy and to advise the Board of the noncompliance. Coopers disputed that any losses resulted from its failure to comply with applicable professional accounting standards. However, Coopers’ investment expert, Dr. John McConnell, concluded that financial losses on securities purchased by Luhmann after June 30, 1993, but before Coopers finished its audit, amounted to approximately $23 million.

The jury returned a verdict for the Board, and both sides appealed, asserting various grounds for relief. The appellate court affirmed judgment on the verdict, rejecting Coopers’ argument that the trial court erred in applying the audit interference doctrine, and holding that Coopers was not entitled to a setoff for the Andersen settlement. 333 Ill. App. 3d at 239, 241.

The appellate court also rejected the Board’s contentions that it was entitled to a judgment notwithstanding the verdict on the issue of comparative fault and that the jury was improperly instructed on that issue. 333 Ill. App. 3d at 243. Those holdings are assigned as error in the Board’s application for cross-relief.

II. ANALYSIS

Coopers asserts that it was improperly restricted in its ability to present evidence of the Board’s contributory negligence by the trial court’s application of the audit interference doctrine. Coopers argues that the doctrine is inconsistent with principles of comparative fault. Whether Illinois law limits the defense of contributory fault in cases against accountants is a matter of first impression for this court. Since this issue presents a question of law, our review is 
de novo.
 
Woods v. Cole
, 181 Ill. 2d 512, 516-17 (1998).

A. The Audit Interference Doctrine

The audit interference doctrine was first adopted by a New York court in 
National Surety Corp. v. Lybrand
, 256 A.D. 226, 9 N.Y.S.2d 554 (1939). The court in 
National Surety
 held that the negligence of an employer who hires an accountant to audit the business is a defense only when it has contributed to the accountant’s failure to perform his contract and to report the truth. 
National Surety
, 256 A.D. at 235, 9 N.Y.S.2d at 563. The audit interference doctrine as announced in 
National Surety
 was applied in Illinois in 
Cereal Byproducts Co. v. Hall
, 8 Ill. App. 2d 331 (1956). In 
Cereal Byproducts
, the appellate court held that contributory negligence could not be asserted by the auditor when there was no evidence that the client interfered with the audit. 
Cereal Byproducts
, 8 Ill. App. 2d at 336.

National Surety 
and 
Cereal Byproducts
 were decided long before this court abolished the doctrine of contributory negligence as an absolute bar to recovery and replaced it with comparative fault in 
Alvis v. Ribar
, 85 Ill. 2d 1, 24-25 (1981). The comparative fault rule adopted in 
Alvis
 was modified by statute in 1986 when the legislature provided for a limitation on recovery in tort actions, as follows:

“In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50% of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff.” Ill. Rev. Stat. 1987, ch. 110, par. 2–1116, codified at 735 ILCS 5/2–1116.
(footnote: 1)
 Since the 1986 version of statute, in effect at the time the Board’s cause of action accrued, was applicable only to “actions on account of bodily injury or death or physical damage to property,” it arguably was not applicable to tort actions where recovery for economic loss is allowed, including actions arising from negligent representations made by one who is in the business of supplying information for the guidance of others in their business transactions. See, 
e.g.
,
 Moorman Manufacturing Co. v. National Tank Co.
, 91 Ill. 2d 69, 86 (1982) (“[t]ort theory is appropriately suited for personal injury or property damage ***[;] [t]he remedy for economic loss *** lies in contract”). Therefore, the “pure” comparative fault rule announced in 
Alvis 
remained applicable to tort actions for recovery of economic loss, such as accounting malpractice actions. See, 
e.g.
, 
Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.
, 159 Ill. 2d 137, 164 (1994) (“[t]ort law has traditionally afforded an avenue of recovery for accountant malpractice”).

In 1992, the legislature added section 30.2 to the Illinois Public Accounting Act (Accounting Act) (225 ILCS 450/30.2 (West 1994)) to provide that the statutory comparative fault modifications apply to tort actions against accountants. The 1992 version of section 30.2, in effect at the time the Board’s cause of action accrued, provided in relevant part:

“Contributory Fault. Except in causes of action based on actual fraud or intentional misrepresentation, the principles of liability set forth in Sections 2–1116 and 2–1117 of the Code of Civil Procedure shall apply to all claims for civil damages brought against any person, partnership, corporation, or any other entity certified, licensed, or practicing under this Act, or any of its employees, partners, members, officers, or shareholders that are alleged to result from acts, omissions, decisions, or other conduct in connection with professional services.” 225 ILCS 450/30.2 (West 1994), 
amended by
 Pub. Act 89–380, §5, eff. August 18, 1995.

Coopers argues that the effect of section 30.2 is to treat economic loss identically with personal injury or property damage. Thus, according to Coopers, application of the audit interference doctrine would frustrate the plain meaning of section 30.2 because not all contributory fault of a plaintiff that is a proximate cause of an economic loss could be asserted as a defense. Instead, only contributory fault that affected or interfered with the audit could be considered. The appellate court rejected this argument, holding that the Accounting Act and the Code do not clearly express the intent to abrogate the audit interference doctrine, a part of Illinois common law. 333 Ill. App. 3d at 240-41. We agree with the appellate court that the trial court did not err in applying the doctrine.

The audit interference doctrine clearly has a foundation in Illinois common law. In 
Cereal Byproducts
, the appellate court relied on 
National Surety 
in rejecting a contributory negligence defense unrelated to the negligence of accountants conducting an audit. 
Cereal Byproducts
, 8 Ill. App. 2d at 336. Common law rights and remedies may, however, be repealed by the legislature or modified by court decision. 
People v. Gersch
, 135 Ill. 2d 384, 395-97 (1990). It is well established that legislation intended to abrogate the common law must be clearly and plainly expressed. 
Maksimovic v. Tsogalis
, 177 Ill. 2d 511, 518 (1997). The Accounting Act contains no reference to the audit interference doctrine, and we can discern no expression of legislative intent to abrogate it. Further, while section 30.2 of the Accounting Act extends the effect of the comparative fault statute to accounting malpractice actions, it does not purport to define the types of conduct that can be considered as the proximate cause of a claimed loss. Accordingly, we conclude that the Accounting Act amendment has a neutral impact on the audit interference doctrine.

With regard to Coopers’ argument that the audit interference doctrine is inconsistent with principles of comparative fault, we note that courts in other jurisdictions have reached conflicting conclusions regarding the continued viability of the audit interference doctrine in the modern comparative fault context. Ohio and Minnesota, modified comparative fault jurisdictions, have rejected the audit interference doctrine as inconsistent with the principles of comparative negligence. See 
Scioto Memorial Hospital Ass’n v. Price Waterhouse
, 74 Ohio St. 3d 474, 477, 659 N.E.2d 1268, 1272 (1996) (holding that the audit interference doctrine was not needed after enactment of Ohio’s comparative negligence statute); 
Halla Nursery, Inc. v. Baumann-Furrie & Co.
, 454 N.W.2d 905, 909 (Minn. 1990) (holding that the audit interference doctrine is inconsistent with modified comparative negligence statute). Conversely, other state courts have retained the audit interference doctrine. See 
Stroud v. Arthur Andersen & Co.
, 37 P.3d 783, 789 (Okla. 2001) (approving a trial court jury instruction allowing consideration only of that negligence of the plaintiff interfering with the accountant’s rendition of professional services); 
Fullmer v. Wohlfeiler & Beck
, 905 F.2d 1394, 1398 (10th Cir. 1990) (holding that the plaintiff’s negligence in an accounting malpractice case is only a defense when the plaintiff’s conduct contributes to the accountant’s failure to perform the work or to furnish accurate accounting information);
 Steiner Corp. v. Johnson & Higgins of California
, 135 F.3d 684, 689 (10th Cir. 1998) (holding that the accountant should not be absolved of the duty undertaken by him on his audit unless the plaintiff’s negligence contributed to the auditor’s misstatement in his reports); 
Collins v. Esserman & Pelter
, 256 A.D.2d 754, 757, 681 N.Y.S.2d 399, 402 (1998) (holding that the plaintiff’s management negligence did not establish that the plaintiff’s conduct substantially impeded defendants’ ability to complete the audit).

We conclude that the holdings in 
Stroud, Fullmer, Steiner 
and 
Collins
 are consonant with the general tort principles applicable to actions against service providers and, in the accounting malpractice context, consistent with the Restatement (Third) of Torts. As stated in the Restatement (Third) of Torts:

“[I]n a case involving negligent rendition of a service, *** a factfinder does not consider any plaintiff’s conduct that created the condition the service was employed to remedy.” Restatement (Third) of Torts: Apportionment of Liability §7, Comment 
m
, at 70 (2000).

The partial concurrence and partial dissent argues that Illinois courts do not follow the interpretation of the Restatement comment we have made here. Yet, in 
Owens v. Stokoe
, 115 Ill. 2d 177 (1986), a dental malpractice case, this court clearly applied this reasoning. The trial court allowed the jury to consider plaintiff’s contributory fault in making dental surgery necessary. This conduct consisted of failure to secure a second opinion, poor dental hygiene, and the refusal to allow the dentist to take X rays of his teeth. In reversing the judgement for defendant, we held:

“In order to reduce the award of damages the negligence of the plaintiff must have been a proximate cause of the injuries. Here, paraesthesia was proximately caused by damage to the left inferior alveolar nerve during surgery. Performance of the surgery caused the injury. Obviously it was not the failure of the plaintiff to obtain a second opinion, or his prior poor oral hygiene, or his refusal, if true, to permit X rays to be taken of his teeth that damaged the nerve. It is undisputed that the paraesthesia resulted from the surgery, and it cannot be said that conduct of the plaintiff prevented Stokoe from properly performing the surgery.” 
Owens
, 115 Ill. 2d at 183-84.

Just as the patient’s poor dental hygiene could not be asserted as a defense to the negligent infliction of a surgical injury, a client’s poor business practices cannot be asserted as a defense to the auditor’s negligent failure to discover and report the client’s noncompliance with investment policy and legal requirements.

This is not to say, however, that comparative fault may not be asserted in the service provider context. Indeed, the jury found the Board to be 45% responsible for the damages resulting from Coopers’ failure to perform the audit properly because of conduct occurring after the expiration of the audit period.

We determine that the application of the audit interference doctrine in the accounting malpractice context is in accord with recognized principles of comparative fault. Accordingly, a client’s poor business practices cannot be asserted as a defense to the auditor’s negligent failure to discover and report the client’s noncompliance with investment policy and legal requirements. We decline to follow the holdings of the Ohio and Minnesota courts, and other courts reaching similar results, because we conclude that those holdings are not compatible with the application of general tort principles.

The partial concurrence and partial dissent asserts that our analysis does not represent the majority position nationwide. We do not set out the holdings of all jurisdictions applying our reasoning in service provider cases because an arithmetical comparison lends no force to our holding. Nevertheless, we note that the Supreme Court of Nebraska has expressly applied the 
National Surety
 holding in an accountant malpractice action. 
Lincoln Grain, Inc. v. Coopers & Lybrand
, 216 Neb. 433, 441-42, 345 N.W.2d 300, 307 (1984). Further, the New Jersey Supreme Court has recently stated that “ ‘when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client.’ ” 
Aden v. Fortsh
, 169 N.J. 64, 75, 776 A.2d 792, 798-99 (2001), quoting 
Conklin v. Hannoch Weisman
, 145 N.J. 395, 412, 678 A.2d 1060, 1068 (1996). We agree with the New Jersey court because its holding is entirely consistent with our holding in 
Owens
. Thus, accountants are held to the same standard as surgeons or any other professional service providers.

Coopers and its 
amicus 
further argue that the application of the audit interference doctrine does not serve public policy because relieving the client from responsibility for negligence not directly affecting the audit itself minimizes the client’s duty of care and encourages clients to take unjustified risks despite their superior knowledge of those risks. They also contend that if the fact finder were allowed to allocate responsibility for all negligent conduct contributing to the ultimate loss, negligent behavior would be deterred, and responsible and forthright cooperation with auditors would be rewarded, thus providing auditors with incentives to follow proper audit procedures. These arguments ignore, however, other incentives more immediate and powerful to management than audits, such as reputation, income, and other similar benefits resulting from competent performance. There are also deterrents such as internal inquiry, shareholder disapproval, civil lawsuits, state and federal regulations, and investigations by independent agencies. Moreover, the audit interference doctrine gives the auditor incentive to exercise more skepticism of the client’s statements, resulting in greater care by the client. We are not persuaded that public policy considerations weigh against the invocation in accounting malpractice actions of the general rule pertaining to apportionment of fault. For the foregoing reasons, we hold that the appellate court correctly affirmed the trial court’s application of the audit interference doctrine.

B. The Board’s Application for Cross-Relief

i. 
Judgment Notwithstanding the Verdict

The Board first contends that, as a matter of law, it cannot be found comparatively negligent based on the evidence submitted to the jury. A reviewing court must follow established standards when determining whether a judgment notwithstanding the verdict is proper. 
Maple v. Gustafson
, 151 Ill. 2d 445, 453 (1992). A judgment notwithstanding the verdict is properly entered only if all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. 
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967). In ruling on a motion for a judgment notwithstanding the verdict, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence and any inferences therefrom, in the light most favorable to the party resisting the motion. 
Mizowek v. De Franco
, 64 Ill. 2d 303, 309-10 (1976).

The Board argues that, as a matter of law, for it to have “interfered” with Coopers’ audit, it must have in some way obstructed the performance of the audit by actively misleading the auditor, knowingly providing false information, committing fraud, or forging instruments. No authority limiting interference to those types of conduct is cited. In 
National Surety
, the court set out hypothetical examples of audit interference, as follows:

“Thus, by way of illustration, if it were found that the members of the firm of Halle & Stieglitz had been negligent in connection with the transfer of funds which occurred at about the time of each audit and that such negligence contributed to the defendants’ false reports, it would be a defense to the action, for it could then be said that the defendants’ failure to perform their contracts was attributable, in part, at least, to the negligent conduct of the firm.” 
National Surety
, 256 A.D. at 236, 9 N.Y.S.2d at 563.

Here, the evidence established that on October 15, 1993, the Board represented to Coopers, in a letter signed by the acting controller, Michael Wagner, that there had been no “violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency” and that “no matters or occurrences have come to our attention up to the date of this letter that would materially affect the financial statements and related disclosure for the year ended June 30, 1993, or although not affecting such financial statements or disclosure, have caused or are likely to cause any material change, adverse or otherwise, in the financial position or results of operations of the City Colleges.” The Board dismisses the representation letter as mere boilerplate, drafted by the auditor in terms most favorable to it. The letter, however, basically memorializes the verbal representations made by Luhmann and Wagner in the meeting with Coopers’ auditors on October 9, 1993. Moreover, Gary Seidleman, Coopers’ engagement partner, testified that he delivered the audit report on October 16, 1993 only because Coopers had received a signed representation letter. Similar representations were made verbally by Wagner and Luhmann in a meeting with Coopers’ auditors on October 9, 1993. This is the type of contributory fault described in 
National Surety
. Thus, as a matter of law, we conclude that the Board could properly be found comparatively negligent based on the evidence submitted to the jury.

 The question of whether the false representations contributed to Coopers’ failure to identify and disclose violations of the Board’s investment policies is a factual question for the jury to decide. 
Blue v. St. Clair Country Club
, 7 Ill. 2d 359, 366 (1955). The evidence was sufficient for the jury to conclude that Coopers relied on the truth of the representations as a condition precedent to releasing its audit report. Similarly, the jury could have concluded from the testimony regarding Luhmann’s investments after June 30, 1993 that the representations were false and knowingly made. Even though the verbal and written misrepresentations were not made until after the field audit work was completed, the “financial emergency” described by Board chairman Gidwitz was not discovered until February of 1994, more than three months after the release of the audit report. The mischaracterization by the Board as to its conduct and investment activity after June 30, 1993, could have been, as Coopers argued, so misleading as to interfere with the audit. Thus, the jury could have rationally concluded that the losses would have been less extensive if discovered earlier.

Based on our review of the record, we conclude that there was sufficient evidence for the jury to conclude reasonably that the false representations contributed to Coopers’ failure to identify and disclose violations of the Board’s investment policies. Accordingly, the trial court did not err in refusing to grant the Board a judgment notwithstanding the verdict.

ii. 
Jury Instruction

The Board also contends that the trial court improperly instructed the jury. Supreme Court Rule 239(a) provides that “[w]henever IPI does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given in that subject should be simple, brief, impartial, and free from argument.” 177 Ill. 2d R. 239(a).

The trial court, over the Board’s objection, instructed the jury as follows:

“With respect to the Plaintiff’s claim for professional negligence, it was the duty of the Plaintiff before and at the time of the occurrence to use ordinary care for the safety of its property. A plaintiff is contributorily negligent, if, one, it fails to use ordinary care for the safety of its property; two, its failure to use such ordinary care is a proximate cause of the alleged injury; and, three, affected Defendant’s preparation of the audit.”

The appellate court found that the given instruction accurately states the law in Illinois and is neither misleading nor argumentative, although the court observed that it might have been worded differently. 333 Ill. App. 3d at 242. The Board argues that the given instruction distorted the audit interference doctrine and prejudicially allowed the jury to consider evidence of City Colleges’ conduct unrelated to the audit.

The first element of the given instruction sets out the duty of care. The Board argues that the “property” suggested by the instruction is the investment portfolio, not the audit. According to the Board, this contradicts the audit interference doctrine because the client’s care respecting the conduct of its business may only be considered if it contributes to the failure of the accountants to perform the audit. 
National Surety
, 256 A.D. at 236, 9 N.Y.S.2d at 563. The second element of the instruction requires that the failure of plaintiff to exercise ordinary care for the safety of its property must be a proximate cause of the injury. The Board claims that the appellate court correctly held that the “injury” is the negligent performance of the audit. Yet, according to the Board, the instruction allowed the jury, by implication, to consider the Board’s alleged lack of care for the safety of its portfolio (the treasurer’s violations of the investment policy) as a proximate cause of the failed audit (the failure to detect and report the investment policy violations). The Board contends that this is an internal inconsistency vitiating the audit interference doctrine.

The Board criticizes the language in the third element because the verb “affected” does not convey the type of hindrance or restraint connoted by such words as “prevented,” “interfered” or “contributed.” The verb “affect” is defined as “to produce a material influence upon or alteration in.” Webster’s Third New International Dictionary 35 (1986). Although the Board criticizes the use of “affect” as a “toothless verb,” we believe it is broad enough and forceful enough to convey the concept embodied in the audit interference doctrine.

The Board contends that the trial court erred in refusing to give its tendered instruction that properly described the application of the audit interference doctrine. The Board’s tendered instruction provided, in pertinent part:

“You can find that the Plaintiff was contributorily negligent only if Plaintiff’s negligence prevented or interfered with the proper performance of Defendants’ audits.”

We are unpersuaded by the Board’s argument. Both instructions comply with the requirement of Supreme Court Rule 239(a). Although, as the appellate court noted, “the instruction might have been worded differently in part” the given instruction nevertheless accurately stated the law. 333 Ill. App. 3d at 242. The instruction sufficiently informed the jury that, in order to constitute contributory negligence, plaintiff’s conduct must affect the audit. We hold, therefore, that the jury was properly instructed on the issue of contributory negligence.

C. Setoff

The appellate court affirmed the trial court’s ruling that Coopers was not entitled to a setoff against the judgment in the amount of the Board’s settlement with Andersen, reasoning that the failed audits of each defendant inflicted separate injury on City Colleges. 333 Ill. App. 3d at 238-39. The question of whether the trial court should have ordered a setoff depends upon interpretation of the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 
et seq.
 (West 1994)), and is therefore subject to 
de novo
 review. 
Robidoux v. Oliphant
, 201 Ill. 2d 324, 332 (2002).

The legislature has provided a comprehensive scheme for the allocation of responsibility for a plaintiff’s damages among multiple alleged tortfeasors. The Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 
et seq.
 (West 1994)) contains three provisions applicable to this case: (1) there is a right to contribution among two or more persons subject to liability in tort arising out of the same injury, even though judgment has not been entered against any or all of them (740 ILCS 100/2(a) (West 1994)); (2) the claim against the non-settling tortfeasors is reduced to the greater either of the amount stated in the releasing instrument or the actual consideration paid (740 ILCS 100/2(c) (West 1994)); and (3) a tortfeasor who settles in good faith is discharged from all liability for contribution to any other tortfeasor (740 ILCS 100/2(d) (West 1994)).

We must first determine whether the harm inflicted by the failed audits arose out of the same injury or indivisible harm. In 
Burke v. 12 Rothschild’s Liquor Mart, Inc.
, 148 Ill. 2d 429, 438-39 (1992), we affirmed the trial court’s finding that two separate defendants were jointly liable for an indivisible harm to the plaintiff. In 
Burke
, the plaintiff suffered from paraplegia as a result of two discrete injuries inflicted by the defendants acting separately. We applied the rule in section 433A of the Restatement (Second) of Torts, providing as follows:

“(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.” Restatement (Second) of Torts §433A (1965).

As the comment to subsection (2) explains:

“Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. *** By far the greater number of personal injuries, and of harms to tangible property, are *** single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.” Restatement (Second) of Torts §433A, Comment 
i
, at 439-40 (1965).

Applying this concept to the two defendants in 
Burke
, we held that in the absence of clear medical evidence establishing an exclusive cause for the plaintiff’s paraplegia, it could have been caused by either defendant’s conduct. Therefore, it was an indivisible harm, and the defendants were jointly and severally liable. 
Burke
, 148 Ill. 2d at 439.

The same reasoning applies with equal force in this case. The Board’s complaint alleged that the investments resulting in the precipitous losses were not made until both Andersen and Coopers had completed their audits. Thus, if either auditing firm had informed the Board that the securities in the City Colleges’ portfolio violated its investment policy, the Board could have ended those investment practices and the later investments that ultimately resulted in the claimed losses would not have occurred. Since any of the audits should have discovered and reported the continuing investment policy violations, it cannot be said that any one of the three audit failures was the sole cause of that harm. It is therefore irrelevant that the failed audits occurred at different times.

Moreover, the Board alleged in its original complaint that Andersen and Coopers were jointly and severally liable for its economic losses. Andersen settled in good faith, thereby extinguishing Coopers’ right to contribution. Consequently, if Coopers were not allowed a setoff in the amount of the Andersen settlement, the statutory scheme would be frustrated because Coopers could get neither contribution nor credit for Andersen’s payment in return for a discharge from liability on the indivisible economic loss resulting from all of the failed audits.

 The Board argues that the original complaint does not control because it was amended after the settlement and before trial to refer only to Coopers. We note, however, that the Andersen settlement agreement contains the following language:

“The settlement amount set forth herein, as between City Colleges and Arthur Andersen, is not intended as full compensation to City Colleges for all injuries and damages it claims in the Lawsuit against all parties, but is a negotiated settlement only for those injuries and damages that City Colleges has claimed as against Arthur Andersen.”

We conclude that the damages claimed against Andersen were exactly the same as, and indivisible from, those claimed against Cooper. The evidence adduced at trial established the entire amount of the claimed indivisible loss alleged in the amended complaint. Therefore, we hold that the appellate court erred when it concluded that the harm could be divided into portions, separately attributable to each defendant. 333 Ill. App. 3d at 238. We further hold that Coopers is entitled to a setoff in the full amount of the Andersen settlement and we direct the trial court to apply the setoff on remand.

III. CONCLUSION

For the reasons stated, we hold that the trial court correctly applied the audit interference doctrine and adequately instructed the jury. The issue of the Board’s contributory negligence was properly submitted to the jury since credible evidence of conduct contributing to or affecting the failed Coopers audit was adduced. The appellate court is therefore affirmed as to those issues. We reverse the appellate court, however, on the issue of setoff and remand the cause to the trial court with directions to credit Coopers with the full amount of the Andersen settlement against the judgment.

Affirmed in part and reversed in part;

cause remanded with directions.

JUSTICE GARMAN, concurring in part and dissenting in part:

I concur with the majority’s finding that defendant is entitled to a setoff against the judgment in the amount of plaintiff’s settlement with Arthur Andersen. I write separately because I conclude that the audit interference doctrine is inconsistent with Illinois’ system of comparative fault. In addition, there is no reasonable basis on which to justify limiting the comparative negligence defense for accountants but not for other service providers. I would find admissible the defendant’s offered evidence of plaintiff’s negligent conduct that was a proximate cause of the alleged injury. Thus, I dissent from the majority’s affirmance of the application of the doctrine in this case.

The majority concludes that section 30.2 of the Accounting Act does not abrogate the common law audit interference doctrine. The majority correctly notes that legislation abrogates the common law only if legislative intent to do so is plainly expressed. 
Maksimovic v. Tsogalis
, 177 Ill. 2d 511, 518 (1997). Whether or not legislative abrogation was effectuated in this case, the courts also have the power to alter or replace judicially created doctrines under rare appropriate circumstances. See 
Alvis v. Ribar
, 85 Ill. 2d 1, 21 (1981). W
e have explained: “When *** the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society.” 
Alvis
, 85 Ill. 2d at 23-24. In 
Alvis
, we acted on this duty by abrogating the common law doctrine of contributory negligence and replacing it with a pure form of comparative negligence. 
Alvis
, 85 Ill. 2d at 25, 28. I would judicially abrogate the audit interference doctrine in the present case because I conclude that our comparative fault system is inconsistent with the doctrine and because its continued application causes an unjust allocation of fault in accountant malpractice cases.

The General Assembly has explained the purpose of our current modified comparative fault system, first enacted in 1986: “The purpose of this Section is to allocate the responsibility of bearing or paying damages *** according to the proportionate fault of the persons who proximately caused the damage.” 735 ILCS 5/2–1116(a) (West 2002). The alleged damage sought in this case was the economic loss suffered as a result of “a series of illegal, inappropriate, and highly risky investments” made by Luhmann, which violated plaintiff’s investment policy. Pursuant to a pretrial ruling, defendant was barred from offering evidence of plaintiff’s oversight of Luhmann’s investment choices and its knowledge of his violations of the investment policy because of the audit interference doctrine.

As explained by the majority, under the doctrine the defendant can only offer evidence that the plaintiff’s negligent conduct was a proximate cause of the alleged injury if the plaintiff impeded the defendant’s provision of services. Slip op. at 9. The defendant’s comparative negligence affirmative defense is limited. This case serves as a perfect example of how the continued application of the audit interference doctrine prevents a complete evaluation of the relative proportion of fault of all parties for the alleged injury. Plaintiff requested compensation for economic loss while defendant was barred by the doctrine from showing the extent that plaintiff’s negligence proximately caused this economic loss. Applying the doctrine is inconsistent with our comparative fault system because it frustrates the very purpose comparative fault is intended to serve. See
 
Standard Chartered PLC v. Price Waterhouse
, 190 Ariz. 6, 41, 945 P.2d 317, 352 (App. 1996) (“We find, however, that the rationale of 
National Surety 
[establishing the doctrine] is incompatible with Arizona law,” because of its comparative fault system); 
Resolution Trust Corp. v. Deloitte & Touche
, 818 F. Supp. 1406, 1408 (D. Colo. 1993) (applying Colorado law) (continued application of the doctrine “would effectively abrogate this clear statement by Colorado’s legislature as to how liability should be apportioned,” when it adopted a comparative fault system).

The majority does not recognize that the audit interference doctrine is inconsistent with comparative negligence. Instead, the majority asserts that continued application of the audit interference doctrine is consistent with “general tort principles” as applied in the context of service providers, which bar allocation of fault to the plaintiff unless the plaintiff’s negligence impeded the defendant’s provision of services. The majority provides nothing more than a nonbinding comment from the Restatement of Torts and a misinterpretation of a single dental malpractice case for its broad assertion that the comparative fault defense is restricted not only for accountants under the audit interference doctrine but also for all other service providers. Slip op. at 8-9.

Contrary to the majority’s assertion, however, Illinois courts consistently allow the typical, unrestricted comparative fault defense in nonaccountant malpractice cases. In a medical malpractice case, the court will give a comparative negligence instruction if the plaintiff patient’s negligence was prior to or was contemporaneous with the defendant physician’s negligence, for example by delaying the pursuit of treatment despite symptoms. 
Malanowski v. Jabamoni
, 332 Ill. App. 3d 8, 15 (2002). We explained in a dental malpractice case: “In order to reduce the award of damages the negligence of the plaintiff must have been a proximate cause of the injuries.” 
Owens v. Stokoe
, 115 Ill. 2d 177, 183 (1986). More recently we stated, “a patient’s failure to exercise ordinary care *** does not absolve the physician’s negligence; it only absolves the physician from damages caused by the patient’s failure to exercise ordinary care.” 
McDonnell v. McPartlin
, 192 Ill. 2d 505, 532 (2000); see also Illinois Pattern Jury Instructions, Civil, No. 105.08 (2000). Illinois case law similarly provides that comparative negligence can be a defense in legal malpractice cases. See 
Nika v. Danz
, 199 Ill. App. 3d 296, 311-12 (1990).

The majority misconstrues 
Owens
 in an attempt to conjure a 
de facto
 audit interference doctrine in the context of all service providers. In 
Owens
, plaintiff brought a dental malpractice claim against defendant because, following oral surgery conducted by defendant, Owens suffered from paraesthesia, a lack of sensation in the lower left portion of his face. 
Owens
, 115 Ill. 2d at 180-81. Specifically, the paraesthesia was caused by damage to the left inferior alveolar nerve that occurred during surgery. 
Owens
, 115 Ill. 2d at 183. The jury reduced the award of $40,000 by 75% because of plaintiff’s comparative fault; the appellate court reinstated the full award, finding insufficient evidence of comparative negligence. 
Owens
, 115 Ill. 2d at 179.

The majority quotes the very section of the opinion that best illustrates my position. Slip op. at 9. We affirmed the appellate court, explaining:

“
In order to reduce the award of damages the negligence of the plaintiff must have been a proximate cause of the injuries. Here, paraesthesia was proximately caused by damage to the left inferior alveolar nerve during surgery
. Performance of the surgery caused the injury. Obviously it was not the failure of the plaintiff to obtain a second opinion, or his prior poor oral hygiene, or his refusal, if true, to permit X rays to be taken of his teeth 
that damaged the nerve
. It is undisputed that the paraesthesia resulted from the surgery, and it cannot be said that conduct of the plaintiff prevented Stokoe from properly performing the surgery.” (Emphases added.) 
Owens
, 115 Ill. 2d at 183-84.

Perhaps the majority interpreted the last sentence of this quote out of context as showing that there is a sort of audit interference doctrine applicable in dental malpractice cases. However, the first sentence of this quote did not say, “In order to reduce the award of damages the negligence of plaintiff must have impeded defendant’s provision of services.” Instead, we were applying general comparative negligence principles. As we explained in this quote, the 
sole
 proximate cause of Owens’s paraesthesia was damage to the nerve during surgery. Because none of plaintiff’s negligent conduct proximately caused the damage to the nerve, evidence about this conduct should not have been considered by the jury. 
Owens
 teaches us that in analyzing malpractice cases, courts must carefully identify the injury for which the plaintiff seeks recovery and must admit evidence only about negligent conduct that is a proximate cause of that injury, whether by plaintiff or defendant.

Thus, in nonaccountant malpractice cases, Illinois courts apply comparative negligence principles, admitting evidence of negligent conduct by plaintiff or defendant that proximately caused the alleged injury. The comparative negligence affirmative defense is not limited to evidence that plaintiff’s negligent conduct impeded defendant’s provision of services. Given this fact, the audit interference doctrine should survive only if there is a reasonable basis on which to distinguish accountants from other types of service providers.

The majority concludes that the application of the doctrine in accountant malpractice cases is consistent with the analysis applied in other types of malpractice cases (slip op. at 8), so it does not attempt to distinguish accountants from other types of service providers. Similarly, defendant’s brief suggests reasons for holding accountants accountable independent from a comparison to malpractice by other service providers. I can think of nothing about the nature of the work done by an accountant that merits greater restrictions on his or her potential affirmative defense. In fact, the work of an accountant, though surely important, influences property alone. It would be difficult, if not impossible, to reasonably argue that purely financial loss is more egregious than the loss of life or liberty that can accompany medical or legal malpractice cases so that restricting only an accountant’s affirmative defense is appropriate.

In the present case, the injury for which plaintiff seeks recovery is, according to the complaint, the economic loss suffered as a result of “a series of illegal, inappropriate, and highly risky investments” made by Luhmann, which violated plaintiff’s investment policy. The complaint further alleges that defendant proximately caused these damages through the auditors’ failure to report these violations by Luhmann. In effect, plaintiff alleges that plaintiff could have avoided suffering economic loss if defendant had not failed to report Luhmann’s investment violations. Defendant sought to admit evidence of plaintiff’s comparative negligence, specifically about plaintiff’s knowledge of Luhmann’s activities and its failure to supervise those activities. Defendant alleges that plaintiff could have avoided suffering that economic loss if plaintiff had properly supervised or acted upon its knowledge of Luhmann’s investment violations.

It is hard to imagine how plaintiff could reasonably argue that defendant’s failure to detect and report the violations was a proximate cause of the claimed injury but that plaintiff’s failure to supervise and act upon its knowledge of the violations was not a proximate cause because both involve an identical type of omission. If comparative negligence principles applied, as they do in nonaccountant malpractice cases, defendant’s evidence would have been admitted. Nonetheless, this negligent conduct by plaintiff did not impede defendant’s audit, so it is not the narrow type of evidence of comparative fault that the audit interference doctrine allows to be admitted. The present case clearly illustrates the conflict between the audit interference doctrine and principles of comparative fault. Thus, I disagree with the majority’s opposite conclusion. Slip op. at 9.

The majority mischaracterizes the evidence defendant sought to admit. The majority attempts to analogize this case to 
Owens
: “Just as the patient’s poor dental hygiene could not be asserted as a defense to the negligent infliction of a surgical injury, a client’s poor business practices cannot be asserted as a defense to the auditor’s negligent failure to discover and report the client’s noncompliance with investment policy and legal requirements.” Slip op. at 9. Defendant did not simply try to admit evidence of any and all examples of “poor business practices.” Defendant offered evidence of a proximate cause of the alleged injury, in accord with comparative fault principles. In contrast, the evidence the defendant offered in 
Owens
 concerned conduct that was not a proximate cause of the injury, so we concluded it should not have been considered by the jury.

In sum, evidence concerning a plaintiff’s negligence that is a proximate cause of the alleged injury generally is admissible under Illinois’ system of comparative fault, which is applied in nonaccountant malpractice cases. I can think of no reason why an accountant’s comparative negligence affirmative defense should be more restricted than that of other service providers. Thus, I would abrogate the audit interference doctrine because it can bar the admission of evidence that the plaintiff’s negligence was a proximate cause of the alleged injury, as it did in the present case.

The majority notes that jurisdictions are split about the viability of the audit interference doctrine in light of subsequent adoption of comparative fault schemes, accurately noting that Ohio and Minnesota have rejected the doctrine because of comparative fault rules. Slip op. at 7-8; 
Scioto Memorial Hospital Ass’n v. Price Waterhouse
, 74 Ohio St. 3d 474, 477, 659 N.E.2d 1268, 1272 (1996); 
Halla Nursery, Inc. v. Baumann-Furrie & Co.
, 454 N.W.2d 905, 909 (Minn. 1990). The majority fails to note, however, that five additional states have explicitly rejected the doctrine for this reason: Michigan (
Capital Mortgage Corp. v. Coopers & Lybrand
, 142 Mich. App. 531, 537, 369 N.W.2d 922, 925 (1985)), Arkansas (
Federal Deposit Insurance Corp. v. Deloitte & Touche
, 834 F. Supp. 1129, 1146 (E.D. Ark. 1992) (applying Arkansas law)), Arizona (
Standard Chartered
,
 
190 Ariz. at 42, 945 P.2d at 353), Colorado (
Resolution Trust
, 818 F. Supp. at 1408 (applying Colorado law)), and Florida (
Devco Premium Finance Co. v. North River Insurance Co.
, 450 So. 2d 1216, 1220 (Fla. App. 1984). In addition, six other jurisdictions have implicitly rejected the doctrine. 
Wegad v. Howard Street Jewelers, Inc.
, 326 Md. 409, 417, 605 A.2d 123, 128 (1992); 
American Trust & Savings Bank v. United States Fidelity & Guaranty Co.
, 439 N.W.2d 188, 189-90 (Iowa 1989); 
Maduff Mortgage Corp. v. Deloitte Haskins & Sells
, 98 Or. App. 497, 503, 779 P.2d 1083, 1087 (1989); 
H. Rosenblum, Inc. v. Adler
, 93 N.J. 324, 350-51, 461 A.2d 138, 152 (1983); see also 
ESCA Corp. v. KPMG Peat Marwick
, 135 Wash. 2d 820, 828-30, 959 P.2d 651, 655-56 (1998); 
Comeau v. Rupp
, 810 F. Supp. 1172, 1182 n.6 (D. Kan. 1992). Thus, the majority’s analysis, relying on four cases from three jurisdictions, does not represent the majority position nationwide. 
Scioto Memorial Hospital Ass’n
, 74 Ohio St. 3d at 477, 659 N.E.2d at 1272.

In addition, the cases cited by the majority are based on a mistaken principle. The 
Fullmer
 case, on which the majority heavily relies, explains its continued application of the doctrine by stating: “We agree *** that accountants are not to be rendered 
immune
 from the consequences of their own negligence merely because those who employ them may have conducted their own business negligently.” (Emphasis added.) 
Fullmer v. Wohlfeiler & Beck
, 905 F.2d 1394, 1398 (10th Cir. 1990). However, rejection of the doctrine and application of comparative negligence would not render accountants immune. Instead, the damages paid by the accountant would 
not include the client’s portion of fault in proximately causing the total economic loss. See 
McDonnell
, 192 Ill. 2d at 532.

Finally, I disagree with the majority’s assertion that it is a better policy to continue to apply the audit interference doctrine. Slip op. at 9. As explained by the majority, the doctrine was established by the 
National Surety
 case to soften the harshness of contributory negligence rules, which completely barred recovery by the client if the client was at all negligent. Slip op. at 5; see also 
Scioto Memorial Hospital Ass’n
, 74 Ohio St. 3d at 476, 659 N.E.2d at 1272. Such concern is unnecessary under a comparative fault scheme because slight negligence by the client will not act as a complete bar to recovery. We have abolished other doctrines created in response to harsh consequences of the contributory negligence rule in the wake of the adoption of our comparative fault system. See, 
e.g.
, 
Alvis
, 85 Ill. 2d at 28 (eliminating the “last clear chance” doctrine).

By applying comparative negligence principles, neither the accountant nor the client is absolved of fault because of the other’s negligence, so both parties have an incentive to use due care. 
Capital Mortgage
, 142 Mich. App. at 537, 369 N.W.2d at 925. While the majority cites “other incentives” such as income and civil lawsuits as deterrents of a client’s negligent behavior (slip op. at 9), these incentives are diminished by potentially allowing a client to recover damages for the entire economic loss caused at least in part by its own negligence. The client should not be able to recover damages it could have avoided itself through acting with reasonable care. 
Devco Premium Finance
, 450 So. 2d at 1220. Even if other incentives exist, considerations of fairness require damages to be allocated according to the parties’ degree of fault in causing the alleged injury. 735 ILCS 5/2–1116(a) (West 2002). No argument by the majority has persuaded me that this statement by the legislature of the purpose of the comparative fault system is inappropriate in accountant malpractice cases.

For the reasons herein, I dissent from the majority’s conclusion that the audit interference doctrine is still in force in Illinois. I would abrogate the audit interference doctrine, reverse the trial court’s rulings about the doctrine and the damages setoff, and remand the cause for a new trial.

JUSTICE THOMAS joins in this partial concurrence and partial dissent.

FOOTNOTES
1:     
1
We note that Public Act 89–7, §15, eff. March 9, 1995, rewrote section 2–1116 of the Code. However, Public Act 89–7 was subsequently held unconstitutional in its entirety in 
Best v. Taylor Machine Works
, 179 Ill. 2d 367 (1997). At this time there is a bill pending to repeal Public Act 89–7 and to reenact the prior statutory provisions in conformance with this court’s decision in 
Best
. See 93d Ill. Gen. Assem., House Bill 3533, 2003 Sess.