In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3632

RONALD R. PETERSON, as Trustee for the estate of Lancelot
Investors Fund, Ltd.,

*Plaintiff-Appellant*,

*v.*

KATTEN MUCHIN ROSENMAN LLP,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 3393 — **Harry D. Leinenweber**, *Judge*.

ARGUED APRIL 16, 2015 — DECIDED JULY 7, 2015

Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. As we discuss in *Peterson v. McGladrey LLP*, No. 14-1986 (7th Cir.) (*McGladrey II*), also issued today, the Trustee appointed to marshal the assets of Lancelot Investors Fund and other entities in bankruptcy (collectively "the Funds") has filed multiple suits against solvent entities that, the Trustee maintains, failed to detect

the peril the Funds were in and help curtail their risks. See also *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594 (7th Cir. 2012) (*McGladrey I*); *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013); *Peterson v. Winston & Strawn LLP*, 729 F.3d 750 (7th Cir. 2013).

This appeal concerns the Trustee's contention that Katten Muchin Rosenman LLP committed legal malpractice during the six years it advised the Funds how to structure their transactions with entitles controlled by Thomas Petters. As we recount in the other opinions we have cited, the Funds loaned money to the Petters vehicles, which in turn supposedly financed some of Costco's inventory. Petters insisted that the Funds not contact Costco; doing that, he said, would upset his favorable business relations with it.

Security for the Funds' advances was supposed to come in two forms: paperwork showing the inventory Petters furnished and Costco's undertaking to pay, and a "lockbox" bank account into which Costco would deposit its payments for the Funds to draw on, eliminating any risk that Petters would put his hand into the till. That is how the Funds described the arrangement to their own investors. Yet Costco never put a penny into the account; all of the money came from a Petters entity. Gregory Bell, who established and managed the Funds, asserts that Petters told him that Costco had insisted on paying one of Petters's vehicles. As we observe in *McGladrey II*, however, Bell (and the Funds) lied to investors about the arrangements and asserted that the money came directly from Costco. The actual setup left the Funds at Petters's mercy—and he had no mercy, just as he never had any dealings with Costco. When Petters's Ponzi scheme collapsed, so did the Funds.

The Trustee's complaint contends that Katten violated its duty to its clients by not telling Bell that the actual arrangement (no checks with Costco, no money directly from Costco) posed a risk that Petters was not running a real business. Katten had been engaged to structure transactions, the Trustee asserts, and part of that duty entails telling the client what contractual devices are appropriate to the situation. The complaint focuses on two periods: first, a time during 2003 when principal contracts were being negotiated and signed; second, a time during 2007 when Petters fell behind in payments to the lockbox (he asserted that Costco was late paying him) and the Funds consulted Katten about what to do. According to the complaint, in 2003 Katten did not advise the Funds to ask for additional protections—the Trustee believes that Katten's lawyers did not recognize the risk from the combination of no contacts and no direct payments, plus the potential that the paperwork purporting transactions with Costco had been forged. The complaint also alleges that in 2007 Katten advised the Funds to defer the due dates on the payments, and that no other change was necessary, even though the delay coupled with the other indicators should have alerted any competent transactions lawyer to the possibility of fraud, and the lawyer should have counseled the client to obtain better security.

The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief may be granted. Instead of taking the complaint on its own terms, the district court's opinion narrates the events from the law firm's perspective. Katten maintains, and the opinion states, that Bell knowingly bypassed verification with Costco in order to obtain a higher interest rate from Petters. Thus the

Funds knowingly took a risk and cannot blame a law firm for failing to give business advice.

There are three problems with this decision. First, it rests on a factual view extrinsic to the complaint and therefore is not an appropriate use of Rule 12(b)(6). The complaint alleges that Bell attributed the Funds' high return at least in part to the lack of direct verification with Costco and that he told some would-be investors about this tradeoff, but it does not allege that Bell was indifferent to legal advice concerning how to curtail risks given the no-contact constraint.

Second, the decision does not engage the complaint's main contention—not that Katten was supposed to do something about Petters's no-direct-contact edict, but that Katten had to alert its client to the risk of allowing repayments to be routed through Petters, drafting and negotiating any additional contracts necessary to contain that risk. As the complaint depicts matters, Bell did not appreciate the difference between funds from Costco and funds from Petters. A competent transactions lawyer should have appreciated that the former arrangement offers much better security than the latter and alerted its client. If a client rejects that advice, the lawyer does not need to badger the client; but the complaint alleges that the advice was not offered, leaving the client in the dark about the degree of the risk it was taking.

The third problem is that the decision does not identify any principle of Illinois law that sharply distinguishes between business advice and legal advice. It is hard to see how any such bright line could exist, since one function of a transactions lawyer is to counsel the client how different legal structures carry different levels of risk, and then to draft and negotiate contracts that protect the client's interests. A

client can make a business decision about how much risk to take; the lawyer must accept and implement that decision. But it is in the realm of legal advice to tell a client that the best security in a transaction such as this one is direct verification with Costco plus direct deposits to a lockbox; the second-best is direct deposits to a lockbox; and worst is relying wholly on papers over which Petters had complete control, for they may be shams with forged signatures by Costco managers who have never heard of Petters. Knowing degrees of risk presented by different legal structures, a client *then* can make a business decision; but it takes a competent lawyer, who understands how the law of secured transactions works (and who also knows what's normal in the world of commercial factoring that Petters claimed to practice), to ensure that the client knows which legal devices are available and how they affect risks.

The district court did not cite any Illinois statute or decision holding that a transactions lawyer never needs to supply a client with legal information that affects the degree of business risk attached to a transaction. Nor does Katten's brief in this court. Our own search did not turn up any such case. The district court relied principally on a federal district court's decision, *Abrams v. DLA Piper (US) LLP*, 2013 U.S. Dist. LEXIS 82484 (N.D. Ind. June 12, 2013), based on Illinois law. The district court quoted this passage:

> The Plaintiffs do not suggest that the Defendant breached a standard of care in the legal services it provided; rather, the Plaintiffs are alleging, in essence, that the Defendant should not have provided legal services at all because the transactions were disadvantageous to the Debtor, and because the Defendant represented the Debtor. The Plaintiffs also allege, however, that the Debtor itself approved every legal action taken by the Defendant on behalf of the Debtor. The advice the Plaintiffs challenge, then,

> is not the legal advice provided by the Defendant. Rather, the Plaintiffs are challenging the Defendant's failure to give the Debtor business advice—specifically, the Defendant's failure to advise the Debtor against engaging in the [transactions]. Such allegations do not state a claim for legal malpractice.

*Id*. at *20–21. That may or may not be a correct statement of Illinois law, but it has nothing to do with the Trustee's claims. The Trustee does not fault Katten for failing to advise the Funds to refuse to do business with Petters. The Trustee faults Katten for not advising the Funds about the value of a direct-deposit lockbox and for not recognizing, even after Petters fell behind in payments, that the existing arrangements were insecure, compared with other arrangements that could have been adopted. Advising clients how best to maintain security for their loans using legal devices is a vital part of a transactions lawyer's job.

The only other case on which the district court and Katten rely comes from the Supreme Court of New Jersey, which wrote:

> Malpractice in furnishing legal advice is a function of the specific situation and the known predilections of the client. An attorney in a counselling situation must advise a client of the risks of the transaction in terms sufficiently clear to enable the client to assess the client's risks. The care must be commensurate with the risks of the undertaking and tailored to the needs and sophistication of the client.

*Conklin v. Hannoch Weisman, P.C.*, 145 N.J. 395, 413 (1996).

It's awfully hard to see how *Conklin* helps Katten, whether or not it represents the law of Illinois—*Conklin* has been cited by two Illinois decisions, but not for the point in the quoted passage, see *Lopez v. Clifford Law Offices, P.C.*, 362 Ill. App. 3d 969, 975 (2005); *Community College District No. 508 v.*

*Coopers & Lybrand*, 208 Ill. 2d 259, 272 (2003)—since the complaint alleges that Katten did *not* advise its clients "of the risks of the transaction in terms sufficiently clear to enable the client to assess the client's risks." The complaint alleges, indeed, that Katten did not advise the Funds *at all* about how different legal devices for securing and collecting on loans affect the risks to which the lenders (i.e., the Funds) are exposed.

Moreover, it is hard to see how *Conklin*'s principle could be applied at the pleading stage. One part of *Conklin* that *Lopez* endorsed is the proposition that legal advice "must be … tailored to the needs and sophistication of the client." *Lopez*, 362 Ill. App. 3d at 975, quoting from *Conklin*. The "needs and sophistication of the client" is a factual issue unsuited to a motion under Rule 12(b)(6). The complaint does not tell us how sophisticated Bell and the Funds were about commercial factoring and the legal devices available for lenders' protection. Nor does it reveal what Katten was hired to do—what kind of advice the Funds wanted, what kind of advice Katten promised to provide. Without knowing these facts, which are matters for summary judgment or trial, it is not possible for the court to determine whether Katten performed its undertaking negligently.

We take the point that a transactions lawyer's task is to propose, draft, and negotiate contractual arrangements that carry out a client's business objective, not to tell the client to have a different objective or to do business with a different counterparty. See *Behrens v. Wedmore*, 698 N.W.2d 555, 572–73 (S.D. 2005) (a lawyer did not commit malpractice by overseeing the closing of an unsecured loan to a borrower that became bankrupt; as "experienced business people" the clients

assumed the risk of the borrower's default). A lawyer is not a business consultant. But within the scope of the engagement a lawyer must tell the client which different legal forms are available to carry out the client's business, and how (if at all) the risks of that business differ with the different legal forms. Even if Bell was determined to do business with Petters, the Fund's lawyers still could have explained how to structure the transactions in a less risky way, and if Petters refused to cooperate then Bell might have reconsidered lending the Funds' money to his operations. The Trustee alleges that Katten did not offer any advice about how relative risks correspond to different legal devices, and its complaint states a legally recognized claim for relief. Whether the law firm has a defense—and whether any neglect on its part caused injury—are subjects for the district court in the first instance.

The judgment is reversed, and the case is remanded for proceedings consistent with this opinion.